**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Sally A. PAPIA, Defendant–Appellant.**

No. 89–1906.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 12, 1990.

Decided Aug. 10, 1990.

Rehearing and Rehearing En Banc
Denied Sept. 11, 1990.

charged a misdemeanor under the amended law for payments made between October 1984 and July 1985. Count 3 charged a felony under the amended law for payments made between August 1985 and June 1986. A jury convicted Papia of all three counts, and she appeals.

Stephen J. Liccione, Asst. U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Marna M. Tess–Mattner, Franklyn M. Gimbel, Gimbel, Reilly, Guerin & Brown, Milwaukee, Wis., for defendant-appellant.

Before COFFEY, EASTERBROOK, and MANION, Circuit Judges.

MANION, Circuit Judge.

The Taft–Hartley Act (the Act), as amended in 1984, makes it a crime (with exceptions not relevant to this case) for an employer to pay union membership dues to a labor organization "willfully and with the intent to benefit himself or other persons...." 29 U.S.C. § 186(d)(1) (Supp. IV 1986). Before the 1984 amendment, the Act required only that the payment be made "willfully"; intent to benefit was not necessary to violate the law. Compare *id.* with 29 U.S.C. § 186(d) (1982). Before 1984, violations of § 186(d) were always misdemeanors, no matter how much money the employer illegally paid. The 1984 amendment changed this, making a violation of § 186(d)(1) a felony if "the value of the amount of money" exceeds $1,000.

Sally Papia manages and directs Sally's Steak House, a restaurant in Milwaukee. She is also the principal owner of the corporation that owns the business. Over a number of years, Papia paid union membership dues on certain of her employees' behalves to Local 122 of the Hotel, Motel, Restaurant Employees and Bartenders Union. A grand jury charged Papia with three counts of violating § 186; each count aggregated a number of payments. Count 1 charged a misdemeanor under the old § 186 for payments Papia made between January and September 1984. Count 2

I.

In 1982, Papia signed a document known as the "1982–1985 Hotel Agreement" (1982 agreement), a purported collective bargaining agreement with Local 122. The 1982 agreement was supposed to apply to all eligible employees. But not all of Sally's eligible employees were enrolled in the union. Instead, Papia submitted the names of seven employees, from all job classifications, to include on the union's membership rolls. Papia told these employees that she had submitted their names to Local 122, and she also paid their membership dues.

The practice of carrying a limited number of Sally's employees on the union's membership rolls began long before 1982; the arrangement had existed under a series of contracts with Local 122 dating back to the early 1970's. The arrangement allowed Papia to avoid full unionization (and the costs associated with it). Indeed, a number of Sally's employees testified at trial that they had no idea that Sally's had a collective bargaining agreement with Local 122, and that they were eligible for union membership.

Papia's cozy arrangement with Local 122 began to unravel in early 1985. Joann Calarco, a waitress at Sally's, had incurred significant medical expenses the past October, and was facing additional expenses in January. Calarco discussed her predicament with her mother, who advised her to contact Vince Gallo, a long-time family friend. Gallo was Local 122's business manager, having replaced Phil Valley, the old business manager (and the union official with whom Papia mainly had dealt in the past) in 1984. Calarco explained her situation to Gallo who, much to Calarco's surprise, told her that Sally's was unionized and that she was eligible to join Local

122 and receive health benefits. Before allowing Calarco to join the union, however, Gallo told Calarco to inform Papia that she wished to join.

When Calarco told Papia that she intended to join the union, Papia became angry. Nevertheless, Calarco joined. After Calarco joined Local 122, two other waitresses joined, and other Sally's employees became interested in joining (principally to take advantage of the union's health benefits). At about this same time, Papia began to receive notices from the administrator of Local 122's employee benefit plans about employer contributions she had failed to make under the 1982 agreement. Also around this time, the FBI began to investigate Papia's relationship with Local 122. Papia told FBI agent Roger Trott that Gallo was "pressuring" her to unionize Sally's. To combat this pressure, Papia's attempt to avoid full unionization moved to a different tack.

Shortly after Papia spoke to the FBI agent, Papia and Gallo began negotiating a new contract for the period beginning in 1985. During these negotiations, Gallo pressed Papia to submit all her eligible employees' names to the union. Papia resisted this because of the cost of paying union benefits for all her employees. Instead, Papia submitted twelve names to Gallo for union membership. However, Papia did not inform these twelve employees that they would be listed on the union rolls. Papia also prepared twelve Local 122 membership cards for these employees, forged their names on them, and submitted them to the union.

On June 15, 1985, the 1982 agreement expired. Negotiations over a new contract continued. A couple weeks later, Papia had ballots prepared for her employees to indicate whether or not they wanted to join Local 122. Each ballot contained a line for the employee to sign. All employees except one (including the twelve employees whose names Papia had submitted to the union) voted against joining Local 122. Papia sent copies of most of these ballots to Gallo. She did not, however, send copies of the ballots signed by the twelve employees

whose names she had previously submitted to Gallo. On October 15, 1985, Papia finally signed the new contract. As she had under the old agreements, Papia continued to pay the union membership dues of the employees the contract purportedly covered.

The FBI continued to investigate Papia's dealings with the union. In January 1986, Papia told Agent Trott that she had gotten Gallo to "back off." Federal agents also interviewed the twelve employees whose names were on the forged membership cards Papia had submitted to the union. After learning of this, Papia prepared "permission slips" for each of these employees, backdated to May 31, 1985, that purportedly gave Papia each employee's permission to enroll that employee in the union. Papia told the grand jury that she had received the employees' permission to sign their names to the membership cards. As we have seen, this did not prevent the grand jury from indicting her, an indictment that led to the conviction now on appeal.

## II.

As we noted at the beginning of this opinion, in 1984 Congress amended § 186(d) to provide that dues payments by employers to labor unions are criminal only if made "willfully" and "with intent to benefit [the employer] or other persons...." 29 U.S.C. § 186(d). Before 1984, § 186(d) explicitly required only that payments be made "willfully" to be criminal. Count 1 charged payments Papia made before the 1984 amendments. Consequently, the indictment charged only that Papia made the payments "willfully."

Papia argues that we must reverse her conviction on Count 1 because the district court required the government to prove only "general intent" as opposed to "specific intent." Papia's argument on this point is not particularly clear because she does not state what she means by the terms "general intent" and "specific intent." These terms have been interpreted to mean different things at different times. For example, courts have used the term "general intent" simply to connote the general

notion that crimes other than strict liability offenses require some kind of *mens rea*, or evil intent. Courts have also used "general intent" to express the notion that a crime requires at least that the defendant intended to perform the act that constitutes the crime. Courts have similarly given "specific intent" different meanings. The most common use of the term is to designate a special mental element beyond that required with respect to the defendant's acts, such as the intent to steal in burglary (or, the intent to benefit in § 186(d)). For a discussion of the different uses of the terms "general intent" and "specific intent," see 1 Wayne LeFave & Austin W. Scott, Jr., *Substantive Criminal Law* § s 3.5(e) (1986). Some commentators have suggested that abandoning the terms "general intent" and "specific intent" would make the criminal law clearer, and the Model Penal Code has abandoned these terms. See *id.* at 316 & n. 66.

■ There are two ways to interpret Papia's argument. First, Papia seems to be complaining about how this court has previously interpreted § 186(d)'s willfulness requirement. In *United States v. Kaye*, 556 F.2d 855, 863 (7th Cir.1977), we held that to act willfully under § 186(d) means to act with "an awareness of [§ 186's] restrictions or a reckless disregard of that section." See also *United States v. Incisio*, 292 F.2d 374, 380 (7th Cir.1961). According to *Papia*, this is not good enough because it requires only that the government prove that she intentionally committed the acts in question, whether or not she had any idea those acts violated the law. Papia argues that willfulness requires proof that the defendant had "a *specific intent* to do an act forbidden by law." See *United States v. Drew*, 722 F.2d 551, 553 (9th Cir.1983). This court's formulation, says Papia, robs § 186(d) of any *mens rea* requirement, and thus violates what Papia characterizes as the Supreme Court's teaching in *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952) that criminal statutes generally require some kind of evil intent.

This argument is meritless. In *Morissette*, a defendant hunting on federal property came upon spent bomb shell casings that he thought had been abandoned. He loaded three tons of the casings onto his truck, took them away, and sold them for scrap. Morissette was tried for conversion under 18 U.S.C. § 641, which provided that "whoever embezzles, steals, purloins, or knowingly converts" government property is subject to criminal punishment. At trial, Morissette maintained that he believed the shell casings were abandoned and that he did not intend to steal the property. The district court, however, refused to allow this defense, and instructed the jury that if Morissette intentionally took the casings, even if he believed they were abandoned, he was guilty. See *id.* at 247–49, 72 S.Ct. at 241–43.

The Court in *Morissette* held that conversion was a crime that required an evil intent or *mens rea*. While Morissette did not have to know that there was a law against conversion, the government had to show at least that Morissette knew the facts that made his taking a crime; in other words, the government had to show that Morissette knew the shell casings were somebody else's (though not necessarily the government's) property and were not abandoned. See *id.* at 270–71, 72 S.Ct. at 253–54. Thus, it was error for the district court not to allow Morissette to present as a defense the fact that he thought the shell casings had been abandoned.

The Court in *Morissette* did not hold, as Papia suggests, that all crimes require a specific intent above and beyond a general *mens rea* or evil purpose. Nor did the court even hold that all crimes necessarily require an evil intent. Conversion was a crime Congress had codified from the common law, and the common law conception of crime had always presupposed an evil intent. However, the Court recognized that Congress could create crimes that did not require criminal intent, making acts criminal not because they are wrong in themselves but simply because Congress pronounced them so. See *id.* at 259–60, 72 S.Ct. at 247–48.

The Court in *Morissette* did not deal with § 186(d), and *Morissette* does not answer the question of what intent § 186(d) requires. As an initial matter, it would not be hard to imagine Congress concluding that there is nothing inherently wrong in employers paying money to unions but that danger exists in the practice so it would be best to outlaw it, regardless of the payor's intent. Indeed, the Supreme Court a few years after *Morissette* described § 186 in dictum as "a criminal provision, *malum prohibitum,* which outlaws all payments, with stated exceptions, between employer and representative." *United States v. Ryan,* 350 U.S. 299, 305, 76 S.Ct. 400, 404, 100 L.Ed. 335 (1956). The Third Circuit, relying on *Ryan's* dictum, interpreted § 186(d) as requiring no "bad purpose." *United States v. Lanni,* 466 F.2d 1102, 1110 (3d Cir.1972).

■ This circuit has never gone so far as to classify § 186(d) as a *malum prohibitum* crime not requiring any *mens rea.* Indeed, we adopted our willfulness formulation in *Incisio* after specifically rejecting the argument that § 186(d) created a strict liability offense. See 292 F.2d at 380. This circuit's formulation, requiring an awareness of or reckless disregard for § 186(d)'s restrictions, is consistent with interpreting § 186(d) to require a *mens rea* element. Moreover, we see little real difference between our willfulness standard and the standard Papia demands: "a specific intent to do an act forbidden by law." A person who intentionally performs an act, aware that the law prohibits the act, or in reckless disregard of the law's prohibitions, has intentionally done an act forbidden by law. We do not see the talismanic significance in the words "specific intent" that Papia sees.

Even if we thought that this circuit's willfulness standard is deficient, Papia cannot complain. The district court instructed the jury that to convict Papia on Count I, it had to find she acted "knowingly" and "willfully." The court went on to instruct the jury that, "An act is done 'willfully' if done voluntarily and intentionally, *and with the intent to do something the law forbids; that is to say, with a purpose either to disobey or disregard the law."* This is precisely the formulation of willfulness that Papia argues is correct, except that the word "specific" does not preface the word "intent" (a difference that is meaningless). The Ninth Circuit in *Drew* approved an almost identical instruction. Compare the instruction quoted above with *Drew,* 722 F.2d at 553 n. 1. To convict Papia on Count I, the jury was required to find precisely what Papia says § 186(d) requires.

Papia also seems to be arguing that even if this court has correctly interpreted § 186(d)'s willfulness requirement, that section, even before 1984, required that the government prove an intent to benefit oneself or another. According to Papia, when Congress amended § 186(d), it was merely "clarifying" the law rather than adding an additional element to the offense. This "clarification," according to Papia, shows that § 186(d) has always required the government to prove intent to benefit.

Papia cites *Brown v. Marquette Savings and Loan Ass'n,* 686 F.2d 608, 615 (7th Cir.1982) for the proposition that when Congress amends a statute but means only to clarify rather than change the law, the amendment is "persuasive authority" of the original statute's proper construction. It is important to emphasize that the later Congress' intent to clarify rather than to change the statute—which is really just evidence of the later Congress' view of the original statute's meaning—is only *persuasive* authority on the original statute's meaning, and like any persuasive authority is entitled only to the weight that the force of its reasoning commands. The later Congress' view is certainly not binding; we must still interpret the original statute ourselves. In this case, even if Congress merely meant to clarify the law in 1984, we cannot interpret § 186(d) (before the amendment) to include a requirement that the government prove an intent to benefit. There is nothing in the text of the statute that even implies such an intent.

In any event, Papia's premise—that in 1984 Congress was merely attempting to

make "clear" that § 186(d) required the government to show an intent to benefit—is wrong. As we noted in *Brown*, a "dispute or ambiguity, such as a split in the circuits [is] an indication that a subsequent amendment was meant to clarify, rather than change, the law." 686 F.2d at 615. There is no ambiguity in the old § 186(d); it clearly required only a willful violation, not intent to benefit. Papia has not cited any case that has held that § 186(d) required intent to benefit before 1984, so there was no circuit split on that point. Thus the indicia we noted in *Brown* indicating that Congress was merely clarifying a statute, rather than changing it, are not present in this case.

Moreover, comparing § 186(d)'s structure before and after amendment scotches any notion that Congress was not adding a new intent element. Before 1984, § 186(d) had no subsections, and provided simply that any willful violation of § 186 was criminal. See 29 U.S.C. § 186(d) (1982). As amended, § 186(d) contains two subsections. Section 186(d)(1), the section we are concerned with, deals with payments by employers of membership dues to labor organizations or joint labor management trust funds; § 186(d)(2) deals with all other payments prohibited by § 186. See 29 U.S.C. § 186(d)(1) & (2) (Supp. IV 1986). Section 186(d)(1) contains the "intent to benefit" requirement; § 186(d)(2) does not. If Congress merely intended to make clear that § 186(d) has always required intent to benefit, it is unlikely that Congress would have added this language to § 186(d)(1) but not to § 186(d)(2). The reasonable conclusion is that Congress meant to add an additional element for certain payments in § 186(d)(1) that would not apply to other payments. The legislative history fortifies this conclusion: for payments under § 186(d)(2), "the committee determined not to include a specific *mens rea* requirement for prosecutions under (d)(2). The *mens rea* requirement for prosecutions under (d)(2) will *continue to be* 'willfully.'" S.Rep. 98–83, 98th Cong., 1st Sess. 13 (1983) (emphasis added); see also S.Rep. 98–225, 98th Cong., 2d Sess. 298, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3478. It is clear that Congress in 1984 read § 186(d) not to require an intent to benefit, and that Congress was adding that requirement as a new element to § 186(d). Thus, even if the amending Congress' view of the original § 186(d)'s meaning is entitled to any great weight, that view does not support Papia's reading of the statute.

■ Papia makes one more argument regarding § 186(d)'s intent element. Papia claims that trying Count 1, which required the government to prove only a willful payment, with Counts 2 and 3, which required the government to prove intent to benefit, put her to an unfair choice: she could either defend Counts 2 and 3 by testifying and denying any intent to benefit anybody by her payments, or defend Count 1 by not putting on any evidence. Papia claims that to have testified on Counts 2 and 3, while claiming she did not intend to benefit herself, would have forced her to admit she made the payments and doomed her defense on Count 1. According to Papia, being forced to make this choice violated her rights to due process and equal protection. How this could have violated her equal protection rights is a mystery to us: Papia does not claim she was singled out because of her race, sex, ethnicity, or some other classification. In any event, Papia has cited no authority for her argument. Federal Rule of Appellate Procedure 28(a)(4) requires that parties accompany their arguments with citation to relevant authorities. Papia states that she has found no direct authority for her argument, but she has not even cited analogous authority. In her reply brief, Papia states that even though she has not cited any authority, "fundamental principles of due process, interpreted in a common-sense manner," establish her argument's correctness. It would have been helpful, however, if Papia had cited (or even argued) those "fundamental principles" of due process she relies on. It is not this court's job to research the law to support an appellant's argument; Papia has waived her due process and equal protection arguments. *Beard v. Whitley County REMC*, 840 F.2d

405, 408–09 (7th Cir.1988); see also *United States v. Williams*, 877 F.2d 516, 518–19 (7th Cir.1989).

There is another reason to hold Papia has waived this argument. The proper remedy for the violation Papia complains about would have been to hold separate trials on Count 1 and Counts 2 and 3. See Fed.R. Crim.P. 14. That way, Papia could have testified in the trial on Counts 2 and 3 and sat silent at the trial on Count 1. Papia never asked the district court for separate trials. Papia claims in her reply brief that she sufficiently raised the due process issue in the district court (though she does not claim she asked for separate trials). However, her entire argument on this point in the district court consisted of one sentence, without authority, baldly claiming that a joint trial would violate her right to due process. Papia's failure to adequately press her due process and equal protection arguments in the district court also results in a waiver of those arguments on appeal. See *United States v. Danovaro*, 877 F.2d 583, 589 (7th Cir.1989).

## III.

■ Papia argues next that the district court erred by allowing the government to aggregate 31 separate payments she made to Local 122 into three counts. As we have noted, the indictment charged two misdemeanors and one felony against Papia. According to Papia, the indictment should have alleged 31 separate misdemeanors against her (since no individual payment exceeded $1,000).

Counts 1 and 2 aggregate 19 separate payments into two misdemeanor charges. If the government had charged each payment as a separate offense, Papia would have faced a maximum prison sentence of 19 years and a maximum fine of $190,000. See 29 U.S.C. § 186(d)(1), which provides a maximum penalty of one year in prison and a $10,000 fine for misdemeanor violations

(the same penalty § 186(d) imposed before amendment). In the charges presented by the government, Papia faced a maximum sentence of two years in prison and a $20,000 fine for the same conduct. The aggregation here worked to Papia's benefit. In *Korholz v. United States*, 269 F.2d 897 (10th Cir.1959), the Tenth Circuit upheld an indictment under § 186 aggregating several separate payments into one misdemeanor count. See *id.* at 899–901. We agree with *Korholz* that there is nothing to prevent the government from aggregating a number of acts that could have been charged as separate misdemeanors into fewer misdemeanors.

Count 3 aggregated 12 of Papia's separate payments in one felony charge. Aggregating what could have been separate misdemeanor charges into a felony charge is different than aggregating separate misdemeanors into one misdemeanor. Where aggregating several misdemeanors into one always benefits the defendant by reducing the maximum penalty possible, aggregating misdemeanors into felonies does not necessarily benefit the defendant. For example, if the government aggregates two $501 payments into one felony charge, the defendant's maximum possible sentence will increase from two years in prison and a $20,000 fine to five years in prison and a $15,000 fine (the maximum penalty for a felony violation of § 186(d)).[1] Moreover, felony convictions may carry certain adverse collateral consequences that misdemeanor convictions do not.

■ Despite this difference, it is still proper in some circumstances to aggregate separate acts into one felony charge. Whether aggregation is proper depends on the facts in each case. The Fifth Circuit held it proper to aggregate a series of misdemeanor larcenies into one felony larceny under 18 U.S.C. § 665 when the defendant formulates a plan or scheme or sets up a mechanism that allows him to take money on a recurring basis. *United States*

---

1. Again, this is not the case for Papia. As charged, Papia faced a maximum sentence of five years in prison and a $15,000 fine on Count 3. If the government had charged 12 separate misdemeanors, Papia would have faced a maximum sentence of 12 years in prison and a $120,000 fine. As with Counts 1 and 2, the aggregation in Count 3 worked to Papia's benefit, at least in terms of potential maximum sentence.

*v. Billingslea,* 603 F.2d 515, 518–20 (5th Cir.1979). However, where a person only has a general intent or desire to take money, and merely acts on that desire from time to time, aggregation is not appropriate. *Id.*

Like the parties, we think this is an appropriate test to apply to the aggregation in this case. Under this test, the aggregation in Count 3 was proper. All the payments Papia made were pursuant to a contract she negotiated with Local 122. This contract established a scheme or mechanism under which Papia was to make recurring dues payments. Since all the payments were the result of this same scheme or mechanism, it was proper to aggregate the payments into one count. Likewise, the *Billingslea* test supplies an alternative basis for the aggregations in Counts 1 and 2. As with the payments charged in Count 3, Papia made the payments charged in Counts 1 and 2 as the recurring result of a single scheme or mechanism (the 1982 agreement).

■ Anticipating that we might reject her argument that the government had to charge 31 separate misdemeanors, Papia makes an alternative (and opposite) argument. According to Papia, if aggregation was appropriate, the government had to aggregate all the payments into one count. Papia had been paying union dues to Local 122 long before the 1982 agreement (under a series of agreements), and she continued paying such dues after the 1982 agreement expired and then after entering the 1985 agreement. Thus, says Papia, all payments flowed from one grand scheme, so only one count was appropriate. Papia

goes on to argue that the government had to charge this count as a misdemeanor under the old § 186(d) because her scheme started before Congress amended the law.[2]

Despite Papia's arguments, the government's three-count charge in this case was proper. Counts 1 and 2 involved payments occurring under the 1982 agreement; Count 3 involved payments occurring under the 1985 agreement. There were substantial differences in Papia's method of operating under the two contracts. Under the 1982 agreement, seven people from all job classifications were listed as union members. Those seven were aware that Papia had signed them up in Local 122. Under the 1985 agreement, Papia submitted twelve names for membership in Local 122. Those workers came from a limited number of job classifications: no hostesses, waitresses, or busboys were listed. The twelve workers listed under the 1985 agreement did not know they were union "members." Most importantly, the evidence allowed an inference that Papia's change in method from that she used under the 1982 agreement came about, at least in part, because of the events surrounding Joann Calarco's joining the union and the subsequent interest among other employees in union membership, and the pressure she received from Vincent Gallo to fully unionize Sally's. Thus, there were two schemes involved in this case, and it was proper to aggregate the payments under each scheme into different counts.

The final question is whether the 1984 amendment justified splitting the payments under the 1982 agreement (payments which occurred both before and after the amend-

---

**2.** If the government could charge only one count in this case, it is not at all clear the government would have had to charge that count as a misdemeanor under the old § 186(d). Papia does not say why the government must do so; we assume she is relying on the Constitution's ex post facto clause, Art. I, § 9. However, "a statute increasing the penalty for [continuing conduct] does not violate the ex post facto clause when applied to [conduct] begun before the increase that continued on after the increase." *United States v. Pace,* 898 F.2d 1218, 1238 (7th Cir.1990). Since Papia's scheme (if there was only one scheme) continued on well after § 186(d)'s amendment, it would not have

violated the ex post facto clause to charge and punish that scheme as a felony. It's true that in 1984 Congress changed § 186(d)'s substance by adding the requirement that the government prove intent to benefit; but this change worked to Papia's benefit by adding an element to the crime and increasing the government's burden at trial. Even if pre-amendment payments had to be charged under the old § 186(d), and all payments had to be charged together, there is no reason why the government could not have exercised its broad discretion over whether to charge by charging only post-amendment payments.

ment) into two counts. We think so. If the government had prosecuted Papia for the pre-amendment payments before the amendment, the government could have continued that prosecution after the amendment because the amendment would not have required abatement of the pre-amendment proceedings. See *United States v. Gruttadauro*, 818 F.2d 1323, 1325 n. 2 (7th Cir.1987). Papia does not question the government's authority to prosecute pre-amendment payments under the old § 186(b). Moreover, the government had to prosecute the post-amendment payments under the new § 186(d); if the government did not charge intent to benefit regarding those payments, it would not have charged a crime. Since the government could prosecute the pre-amendment payments under the old § 186(d) and had to prosecute the post-amendment payments under the amended § 186(d), it was proper to charge the pre- and post-amendment payments under the 1982 agreement in two counts.

### IV.

Papia finally argues [3] that the district court erred by allowing the government to introduce a letter to Papia that contained a handwritten note on the bottom. The letter's text referred to employer contributions Papia had failed to make under the 1982 agreement. The handwritten note stated, "Joey Bal told JJ and me to forget about it and not worry." Papia did not object to the letter's text, which was properly admissible as a business record under Fed.R.Evid. 803(6). Papia objected only to the handwritten note, arguing first that the note was hearsay, Fed.R.Evid. 802, and second that the note's potential for unfair prejudice substantially outweighed its probative value, Fed.R.Evid. 403.

The government argues that the handwritten note is not hearsay. According to the government, the note corroborates that Papia read the letter, and thus was aware of some of the costs to her of unionization. Therefore, says the government, the note sheds light on Papia's state of mind, and was not hearsay.

We need not decide whether the note was hearsay. The government's argument presumes Papia wrote the note. For the note to be admissible, Papia had to have written it. If the note was "offered to prove the truth of the matter asserted," Fed.R.Evid. 801(c), but Papia wrote it, it would be admissible as an admission. See Fed.R.Evid. 801(d)(2). On the other hand, if the note was not Papia's, the note would be irrelevant to her state of mind. The real question, then, is not whether the note was hearsay; it is whether the government properly authenticated the note by introducing "evidence sufficient to support a finding that the note is what its proponent claims" (in this case, a note written by Papia). Fed.R.Evid. 901(a).

Although Papia argues on appeal that the note was not properly authenticated, she never mentioned lack of authentication in her objections in the district court. Therefore, she has waived the authentication issue unless it was plain error for the district court to admit the note. See *United States v. Field*, 875 F.2d 130, 134–35 (7th Cir.1989); Fed.R.Evid. 103(a) and (d). There was no plain error in this case; indeed, there was no error at all. Papia complains that nobody specifically testified that the note was her writing. But the court admitted other documents containing Papia's handwriting into evidence, and the jury could compare the note at the bottom of the letter to the writing in those documents. See Fed.R.Evid. 901(b)(3). Moreover, other circumstances point to the conclusion that Papia wrote the note. Agent Trott testified that he obtained the letter from Sally's Steak House's files pursuant to a grand jury subpoena, and that the letter contained the note when he received it. The letter was addressed to Papia, and witnesses testified that Papia alone handled all matters relating to Local 122. In short, there was sufficient evidence for the

---

**3.** Papia raises two other arguments that we have disposed of in a separate unpublished order released today.

jury to find Papia wrote the note, which is all the authentication Rule 901 requires.

That leaves Papia's argument that the note's potential for unfair prejudice outweighed its probative value. On appeal, Papia argues that the mention of "Joey Bal" in the note was "overwhelmingly prejudicial." This is so, says Papia, because Joseph Balistrieri (Joey Bal) is a member of the Balistrieri family. Papia claims that the Balistrieris are known to use the name "Bal," and that the Milwaukee media frequently report the family members to be organized crime leaders. Thus, argues Papia, the note connects her to organized crime, a connection that is both unfair and unnecessary in a case having nothing to do with organized crime.

We reject this argument for two reasons. First, while Papia objected in the district court under Rule 403, she did not argue that the reference to "Joey Bal" in the note created prejudice because of Joey Bal's reputed connection to organized crime. Thus, the district court never had an opportunity to analyze this argument, and we can hardly review a decision the district court never had to make. Second, Papia has failed to supply any factual basis to support her assertion, or the likelihood that the jurors would necessarily equate Joey Bal with Balistrieri or that the jurors would even know who Balistrieri was. Without this factual basis, we can only conclude that the district court did not abuse its discretion in admitting the note. See *Thronson v. Meisels*, 800 F.2d 136, 142 (7th Cir.1986). For the above reasons, we affirm Papia's conviction.

AFFIRMED.