138 F.3d 706
 55 Soc.Sec.Rep.Ser. 969, Medicare & Medicaid Guide
P 46,150
PARAMOUNT HEALTH SYSTEMS, INC., personally and on behalf of
all persons similarly situated, Plaintiffs-Appellees,
v.
Robert W. WRIGHT, Director, Illinois Department of Public
Aid, and Donna E. Shalala, Secretary of Health and
Human Services, Defendants-Appellants.
 Nos. 96-3457, 96-3458.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 17, 1997.
Reargued Jan. 15, 1998.
Decided March 19, 1998.
 
 Bruce S. Sperling (argued), Sperling, Slater & Spitz, Chicago, IL, Mark J. Bereyso, Scott H. Reynolds, Judith S. Sherwin, Levenfeld, Eisenberg, Janger, Glassberg & Samothy, Chicago, IL, for Paramount Health Systems, Inc.
 Daniel P. Hogan, James B. Riley, Jr., ross & Hardies, Chicago, IL, Steven Kaufman, Peter K. Levitt (argued), Ropes & Gray, Boston, MA, for Metropolitan Ambulance Ass'n.
 James C. O'Connell, James C. Stevens, Mark Lichtenfeld, Office of the Attorney General, Chicago, IL, for Robert Wright.
 Thomas P. Walsh, Office of the United States Attorney, Civil Division, Barbara C. Biddle, Alisa B. Klein (argued), Department of Justice, Civil Division, Washington, DC, for Donna Shalala.
 Before POSNER, Chief Judge, and COFFEY and RIPPLE, Circuit Judges.
 POSNER, Chief Judge.
 
 
 1
 The question we were asked to decide when this case was first appealed by Health and Human Services and its Illinois counterpart was whether, as both appellants (collectively, "the government") contend, federal law permits the state to reimburse providers of medical care to a class of Medicare beneficiaries known as "qualified Medicare beneficiaries" ("QMBs," pronounced "quimbies," and we shall use the phonetic spelling to spare the reader an acronym) at Medicaid rates rather than at Medicare rates. The district judge in this class action on behalf of such providers (a term that we are using in its colloquial sense rather than in its technical Medicare senses, see, e.g., 42 U.S.C. §§ 1395x(u), 1395cc(e)) held, in agreement with decisions of the four other circuits in which the issue had arisen, that federal law indeed required reimbursement at the higher, Medicare rates. See Rehabilitation Association of Virginia, Inc. v. Kozlowski, 42 F.3d 1444 (4th Cir.1994); Haynes Ambulance Service, Inc. v. Alabama, 36 F.3d 1074 (11th Cir.1994) (per curiam); Pennsylvania Medical Society v. Snider, 29 F.3d 886 (3d Cir.1994); New York City Health & Hospitals Corp. v. Perales, 954 F.2d 854 (2d Cir.1992). The judge issued an injunction commanding the government to reimburse the members of the class at those rates, but he stayed the injunction pending this appeal. As a result of subsequent legislation that led us to order supplemental briefing and reargument, it is no longer clear whether, even if the district judge's decision was correct when made, it is correct today. But it will simplify discussion to examine his ruling first under the law at the time.
 
 
 2
 The state makes a pair of threshold arguments not joined by the federal government, which was included as a defendant only, so far as we can determine, because it approved the provision of the state's Medicaid plan that denies reimbursement to providers of services for quimbies at Medicare rates. The first argument is that Paramount, the class representative, lacks standing to sue in federal court because it is not a direct provider of services to quimbies. Instead it sells these services to nursing homes which in turn provide them to its quimby residents. The state argues that Paramount should seek reimbursement from the nursing homes, its customers, rather than from the state. Paramount replies that the nursing home is a mere conduit, which unless it receives reimbursement of 100 percent of a given expense will not reimburse Paramount in full. This is not clear from the record. But no matter. The state's argument is premised on the state's view of the merits. The state assumes that quimbies are Medicaid patients; and under the state's Medicaid plan Paramount is required to bill the nursing homes directly. But Paramount claims that quimbies are Part B Medicare patients, and services to such patients are billed not to the patient's nursing home but to a Medicare fiscal intermediary for the 80 percent of the bill that Part B pays, and, in the case of quimbies, to the state for the remaining 20 percent. The state is arguing the merits in the guise of challenging the plaintiff's standing.
 
 
 3
 The state's second argument on standing is that Paramount has no right to sue it (formally, its officials) to enforce the Medicaid Act. And it is true that the Act does not give providers in Paramount's position an express right to sue state officials. But the providers can, as they have done, sue them under 42 U.S.C. § 1983 if they are within the class intended to be benefited by the Medicaid Act. Blessing v. Freestone, 520 U.S. 329, ----, 117 S.Ct. 1353, 1359, 137 L.Ed.2d 569 (1997); Wilder v. Virginia Hospital Association, 496 U.S. 498, 508-09, 110 S.Ct. 2510, 2516-17, 110 L.Ed.2d 455 (1990); Marie O. v. Edgar, 131 F.3d 610, 618-19 (7th Cir.1997). On Paramount's interpretation, the Act's provisions concerning quimbies require the states to use their Medicaid funds to reimburse providers at Medicare rates. This makes the providers intended beneficiaries of those provisions, and therefore enables them to sue under section 1983. Rehabilitation Association of Virginia, Inc. v. Kozlowski, supra, 42 F.3d at 1449-50; cf. Wilder v. Virginia Hospital Association, supra, 496 U.S. at 510, 110 S.Ct. at 2517-18.
 
 
 4
 So we can turn to the merits.
 
 
 5
 Quimbies are elderly or disabled persons who qualify for Medicare and who, in addition, either qualify by reason of their poverty for Medicaid as well, in which event they are called "dual eligibles," or, though not poor enough to qualify for Medicaid, cannot easily afford to pay the Medicare Part B premiums, deductible, and copayments; these quimbies are called "pure quimbies." 42 U.S.C. § 1396d (p)(1). Part A of the Medicare program, which covers hospital services, is not at issue in this suit. Part B covers nonhospital services. Persons who decide to enroll in it must pay monthly premiums and also swallow the first $100 of their medical bills for certain of the services covered by Part B; that is the deductible we mentioned. Most important is Part B's copayment provision. Medicare Part B pays only 80 percent of the approved charge for services reimbursed under it, so that the participant must, to the extent that his medical expenses are not covered by private insurance, dig into his own pocket to pay the balance.
 
 
 6
 Quimbies, however, are excused from the premium, deductible, and copayment provisions. The state bears these costs because federal law makes state participation in the Medicaid program, for which the federal government picks up a minimum of half the tab, conditional on the state's agreeing to defray those Medicare costs of quimbies that the federal government does not reimburse, 42 U.S.C. §§ 1396a(a)(10)(E)(i), 1396d(p)(3), even though "pure" quimbies are not even eligible for Medicaid. The 20 percent copayment is at the heart of this suit. The law is perfectly clear that the states if they want to be part of Medicaid (as all but one do) must pay the Part B premiums, the deductible, and the 20 percent copayment (the other 80 percent being paid by the federal government, just as with other Medicare participants). But the law is not perfectly clear about what cost figure to use in figuring the copayment, and with what consequence. (Remember that we are speaking of the law as it stood when the district judge issued the injunction.)
 
 
 7
 The government argues that even under that law it is the Medicaid, not the Medicare, cost that should be used. The Medicare ceilings are almost always higher. This can make a big difference to the providers' entitlements and the government's expense. Suppose that for the same service the Medicare-approved rate is $100 and the Medicaid-approved rate only $70. Paramount claims that when it renders the service to a quimby, it is entitled to be reimbursed $80 by the federal government (which is conceded) and (what is contested) $20 by the state (of which the actual cost to the state would be at most $10, since the federal government pays at least half). Otherwise Paramount will be rendering for only $80 a service to a Medicare beneficiary for which Medicare entitles it to $100. The government counters that the proper payment is $70, the Medicaid rate, and that since Health and Human Services is reimbursing the provider $80, the state need give the provider nothing; the provider is already being overpaid, since $80 is larger than $70.
 
 
 8
 The government's argument implies that in facilitating the access of quimbies to Part B of Medicare at the (partial) expense of the states, Congress was reducing the reimbursement of providers of Medicare services to this class of Medicare beneficiaries, with the result that Medicare providers would receive different compensation ($100 versus $80, in our example) for rendering the identical services to different Medicare beneficiaries. Congress may have wanted to do this, but the indications are scanty. The category of "dual eligibles" goes back to the original Medicaid and Medicare statutes of 1965, and, as pointed out in the Rehabilitation Association case, at first states were not required to pick up the full 20 percent copayment tab. 42 F.3d at 1451-52; id. at 1467 (dissenting opinion). But the Medicaid Act defines "medicare costsharing" to include Medicare Part B premiums, the $100 deductible, and the 20 percent Medicare copayment. 42 U.S.C. § 1396d(p)(3). And it requires the states participating in Medicaid to "mak[e] medical assistance [i.e., Medicaid funds] available for medicare cost-sharing" as thus defined. 42 U.S.C. § 1396a(a)(10)(E)(i). The natural inference from requiring the state to share (to the extent of Part B premiums and deductible plus 20 percent of the medical expense) the Medicare cost of a class of Medicare beneficiaries is that it is indeed the Medicare, not the Medicaid, cost that the state is being asked to bear.
 
 
 9
 The government points us, however, to a section of the Medicaid Act which provides that in the case of the 20 percent copayment, the state's Medicaid plan "may provide payment [to providers, for services to quimbies] in an amount ... exceeding the amount that is otherwise payable under the State plan ... for eligible individuals [i.e., eligible for Medicaid] who are not" quimbies. 42 U.S.C. § 1396a(n) (emphasis added). The government argues that this language makes the state's duty of reimbursement at Medicare rates optional, and if this is right, then since section 1396a(a)(10)(E)(i) appears to make such reimbursement mandatory, the Act as a whole (so far as bears on the issue of cost-sharing for quimbies) is ambiguous, thus bringing into play the Chevron doctrine of deference to agency interpretations of vague or incomplete statutes. Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); see, e.g., Hanson v. Espy, 8 F.3d 469, 474-77 (7th Cir.1993); Watkins v. Blinzinger, 789 F.2d 474, 478 (7th Cir.1986); Gunn v. U.S. Dept. of Agriculture, 118 F.3d 1233, 1238 (8th Cir.1997).
 
 
 10
 Granted, an alternative possibility is that the permissive language is just intended to avoid an ambiguity that would be created by the Medicare cost-sharing language if the statute did not explicitly authorize the state to exceed the Medicaid cost level. The statute elsewhere forbids the state under dire penalties to reimburse providers in excess of prescribed levels, 42 U.S.C. § 1396c, lest the states squander funds provided to them by the federal government. See 42 U.S.C. § 1396b(a)(1); see also Pennsylvania Medical Society v. Snider, supra, 29 F.3d at 895. The language of section 1396a(n) makes clear that the ceiling can be pierced without penalty if necessary to enable the state to comply with the requirement that it reimburse the providers of services to quimbies at Medicare rates--which is why the provision excludes premiums, since they are not reimbursements to providers.
 
 
 11
 But this interpretation is undermined by the fact that if, as Paramount must and does argue, the statute clearly entitles it to reimbursement at Medicare rates (if it is not clear, Chevron is back in play), the state could hardly be penalized for such reimbursement. That would be penalizing it for complying with the statute. What is more, section 1396a(n) dates only from 1986. Providers of services for dual eligibles had for more than twenty years--since the original enactment of the Medicaid and Medicare statutes--been receiving reimbursement at higher than Medicaid rates not only without penalty but also without anyone, so far as we are aware, raising the spectre of possible penalties.
 
 
 12
 Another problem with Paramount's interpretation is that even after the enactment of section 1396a(n) in 1986, states were for a time still not required to reimburse dual eligibles at full Medicare rates. This was because of a provision, 42 U.S.C. § 1396a(a)(15), that was not made applicable to the new (the pure) quimbies, who instead were placed under section 1396a(a)(10)(E), the section we quoted earlier that appears to require full Medicare cost-sharing, and section 1396a(n). If these two sections are read as Paramount desires and thus require full Medicare cost-sharing for pure quimbies, it means that in 1986 Congress decided that the states must be more generous to pure quimbies than to dual eligibles, even though pure quimbies are the more affluent quimbies. Remember that dual eligibles are persons who because of their poverty qualify for Medicaid as well as Medicare, while pure quimbies are not poor enough to qualify for Medicaid.
 
 
 13
 Is all this enough to render the statute ambiguous and thus bring the Chevron doctrine into play despite the contrary view of the four circuits to have addressed the issue? Before trying to answer this question, we should consider the bearing of the Balanced Budget Act of 1997, Pub.L. 105-33, 111 Stat. 251, which was not available to those courts. Section 4714(a) of the Act provides that a state is not required to reimburse providers of services to quimbies at Medicare rates, and subsection (c) makes the provision in (a) applicable both to services rendered after the date of enactment and to services rendered before enactment if payment for those services was an issue in a suit pending on that date, as this suit was. Clearly the Act extinguishes any right the plaintiffs might have to be reimbursed at the Medicare rates for services they provide to quimbies after the date of enactment; the question is whether it also extinguishes their right to services they provided before.
 
 
 14
 The answer is clearly "yes" if, as the Ninth Circuit concluded in Beverly Community Hospital Ass'n v. Belshe, 132 F.3d 1259 (9th Cir.1997), section 4714(a) merely clarifies, and by clarifying confirms the government's version of, the original meaning of the quimby reimbursement provisions. There is an air of unreality in treating section 4714(a) as an attempted clarification of original statutory meaning, although it is captioned "Clarification Regarding State Liability for Medicare Cost-Sharing." The disputed quimby provisions date from 1986 (see Pub.L. No. 99-509, § 9403, 100 Stat. 1874, 2053-56)--eleven years before the Balanced Budget Act was passed. The membership of Congress had largely turned over during the interim and surely few members of the 105th Congress who had been members of Congress back in 1986 remembered what the membership's intentions had been regarding the esoteric issue of the reimbursement rate for providers of medical services to quimbies. In any event, Congress is not an interpretive body and has no felt duty to maintain continuity with the past. "The views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." United States v. Philadelphia National Bank, 374 U.S. 321, 348-49, 83 S.Ct. 1715, 1733, 10 L.Ed.2d 915 (1963); see also South Dakota v. Yankton Sioux Tribe, --- U.S. ----, ---- - ----, 118 S.Ct. 789, 803-04, 139 L.Ed.2d 773 (1998). The location of the 1997 amendments in a statute labeled the "Balanced Budget Act" and concerned primarily with cutting the federal deficit hardly creates confidence that Congress was, court-like, interpreting the 1986 statute. It is far more realistic to regard the 1997 quimby provisions as designed to change the original statute in order to reduce the cost of Medicaid to the federal government. Nothing in the provisions themselves suggests a process of interpretation; they merely declare that the states are not required to reimburse quimby providers at the Medicare rate.
 
 
 15
 Yet we have been instructed that subsequent legislation "declaring the intent of an earlier statute is entitled to great weight in statutory construction." Loving v. United States, 517 U.S. 748, 770, 116 S.Ct. 1737, 1749, 135 L.Ed.2d 36 (1996); Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 118 n. 13, 100 S.Ct. 2051, 2061 n. 13, 64 L.Ed.2d 766 (1980); Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 380-81, 89 S.Ct. 1794, 1801-02, 23 L.Ed.2d 371 (1969); Brown v. Marquette Savings & Loan Ass'n, 686 F.2d 608, 615 (7th Cir.1982). This precept is not easy to reconcile with the language we quoted from Philadelphia National Bank--language quoted approvingly by the Supreme Court just months ago in the Yankton case. Or with the principle that Congress cannot direct the outcome of a pending case without changing the law applicable to that case. E.g., Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 218, 115 S.Ct. 1447, 1452-53, 131 L.Ed.2d 328 (1995); Robertson v. Seattle Audubon Society, 503 U.S. 429, 441, 112 S.Ct. 1407, 1414-15, 118 L.Ed.2d 73 (1992); United States v. Klein, 80 U.S. (13 Wall.) 128, 146-47, 20 L.Ed. 519 (1872); United States v. Papia, 910 F.2d 1357, 1362-63 (7th Cir.1990); Benjamin v. Jacobson, 124 F.3d 162, 173-74 (2d Cir.1997). Otherwise a disappointed litigant in a statutory case in a federal district court could scurry to Congress while the case was on appeal and request a "clarifying" amendment that would reverse the interpretation that the district judge had given to the statute, even if that meaning was crystal clear and even though a statute depriving a litigant of a judgment that he had won and that had become final after exhaustion of appellate remedies would be an unconstitutional taking unless the litigant received just compensation. Central States, Southeast & Southwest Areas Pension Fund v. Lady Baltimore Foods, Inc., 960 F.2d 1339, 1345-46 (7th Cir.1992); Tonya K. v. Board of Education, 847 F.2d 1243, 1247-48 (7th Cir.1988); Axel Johnson Inc. v. Arthur Andersen & Co., 6 F.3d 78, 83-84 (2d Cir.1993). There was no final judgment here and so no taking under the "vested rights" line of cases just cited. But the principle that Congress can't direct a judgment in a pending case is based not on the takings clause of the Fifth Amendment but on Article III, which vests the judicial power of the United States in the judicial rather than the legislative branch. See Central States, Southeast & Southwest Areas Pension Fund v. Lady Baltimore Foods, Inc., supra, 960 F.2d at 1345; Axel Johnson Inc. v. Arthur Andersen & Co., supra, 6 F.3d at 83-84.
 
 
 16
 It is tempting to try to reconcile the Loving line and the Philadelphia National Bank line by saying that the difference is that the first involves actual legislation and the second mere legislative materials, committee reports and the like ("legislative history"--a curious term to use of legislators' statements made after the legislation sought to be interpreted had been enacted). This will work for some of the cases, such as GTE Sylvania, Philadelphia National Bank, and United States v. United Mine Workers, 330 U.S. 258, 281-82, 67 S.Ct. 677, 690, 91 L.Ed. 884 (1947), in the Philadelphia National Bank line, and Loving and Red Lion in the Loving line. But Yankton, along with Rainwater v. United States, 356 U.S. 590, 593, 78 S.Ct. 946, 949, 2 L.Ed.2d 996 (1958), gives little weight to subsequent legislation as a guide to interpreting an earlier Congress's intent. And Yankton is the Supreme Court's latest word on the subject.
 
 
 17
 So we're in a quandary concerning the continued vitality of the Loving line, and would welcome clarification from the Supreme Court--pending which we feel constrained by Loving to give some weight to Congress's declaration in the Balanced Budget Act that providers of services to quimbies are not entitled to reimbursement at full Medicare rates. Although we don't how much weight to give it--probably rather little in the circumstances--it is enough to tip the balance in favor of Chevron deference. The Act is a hopeless muddle so far as quimby reimbursement is concerned, and while it seems to us that Paramount has the better interpretation, there is sufficient ambiguity to require us to defer to the government. The judgment of the district court must therefore be reversed.
 
 
 18
 There is, however, a subordinate issue still to be discussed. Paramount argued, and the district court held, that Paramount is entitled to be reimbursed for the services it provides for quimbies in nursing homes from the state directly, rather than from the nursing homes. Because it is unclear whether the issue is independent of the main issue and survives our resolution of it, we shall remand the case and ask the district court to reconsider its ruling on the subordinate issue.
 
 
 19
 REVERSED AND R EMANDED.