**PONTARELLI LIMOUSINE, INCORPORATED, et al., Plaintiffs–Appellants,**

v.

**CITY OF CHICAGO, et al., Defendants–Appellees.**

No. 90–1923.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 19, 1991.

Decided April 8, 1991.

Rehearing and Rehearing En Banc Denied May 10, 1991.

Bertrand A. Rice, Charles Pressman, Chicago, Ill., for plaintiffs-appellants.

Wm. Carlisle Herbert, Hopkins & Sutter, Emily Nicklin, Office of the Corp. Counsel, Marc J. Chalfen, Randolph E. Ruff, William J. Raleigh, Dehaan & Richter, Morris G. Dyner, Dan Brusslan, Paul D. Streicher, Joel Miller, Fischel & Kahn, Chicago, Ill., for defendants-appellees.

Before WOOD, Jr., POSNER and MANION, Circuit Judges.

POSNER, Circuit Judge.

Ten livery companies licensed by the City of Chicago sue the City in this case, claiming that it denied them equal protection of the laws by refusing to allow them to use dispatchers' booths at O'Hare Airport, which is owned by the City. A jury awarded the plaintiffs more than $400,000 in damages, but the district judge then entered judgment for the City (the only remaining defendant) notwithstanding the verdict. 735 F.Supp. 782 (N.D.Ill.1990). The plaintiffs ask us to reinstate the verdict.

This litigation has its origin almost twenty years ago when the City, distressed by

traffic congestion at O'Hare, established a livery dispatch system. Until then livery drivers had been accustomed to park their cars outside the terminals while they hawked within for "walk-up" passengers—arriving passengers who had not arranged for ground transportation in advance. The parked cars blocked traffic. The principal offenders were the suburban livery services, simply because most livery business at the airport is suburban. Taxi service (and now the rapid-transit system, the "subway" or "el" as it is loosely and inconsistently called) is cheaper than livery service for destinations in Chicago, but more expensive for most destinations in the suburbs. Under the livery dispatch system, drivers are forbidden to park at the terminal unless and until they have a passenger. Either they have a prior arrangement to pick up the passenger when he arrives or they wait in a satellite lot until summoned by a dispatcher stationed in a booth in the terminal. The dispatcher hawks fares the way the drivers themselves used to do, only without blocking traffic.

Because livery dispatch booths were considered unsightly and the dispatchers boorish and raucous, the City wanted to limit the scope of the livery dispatch system. To this end it confined the right to use the booths to dispatchers for suburban livery services. It was not that those dispatchers were considered more refined and mannerly than dispatchers for City-licensed services would have been, but that, for the economic reason already indicated, the principal demand for livery service among "walk-up" passengers was for service to suburban destinations rather than to destinations in the city. Two Chicago-licensed livery services, however, became affiliates of suburban livery services, and the dispatchers for those suburban livery services began to dispatch the occasional "walk-up" passenger seeking transportation to the city to Chicago-licensed livery services affiliated with the suburban services. This development precipitated in 1977 a lawsuit in Illinois state court against the City of Chicago by three Chicago-licensed livery services—not the plaintiffs in this case—that were not affiliated with suburban livery services.

This was the *Chicago Courtesy* litigation. It was a triumph for the plaintiffs. In 1982 the court found a denial of equal protection, awarded damages of $1.9 million, and entered an injunction. The plaintiffs agreed to a reduction of the damages award to $1.2 million in exchange for the City's dropping its appeal. In 1986, in exchange for some further consideration, the plaintiffs agreed with the City to vacate the 1982 judgment and the state court did so.

This suit, filed in 1983, is essentially a reprise of the *Chicago Courtesy* litigation. The plaintiffs complain about the different access to the dispatch booths for suburban and urban liveries, about the different treatment of affiliated and nonaffiliated liveries, and finally—the only new twist—about the different treatment between themselves and the plaintiffs in *Chicago Courtesy*, who like themselves are not affiliated with suburban liveries yet continued, notwithstanding the vacation of the 1982 judgment, to use the livery dispatch booths at O'Hare (which, by the way, the City has since shut down). The first question on appeal, indeed—so close are the two cases—is whether the district judge erred in refusing to give the judgment in *Chicago Courtesy* collateral estoppel effect in this case, which would establish that the City had denied these plaintiffs the equal protection of the laws. He did not err. A vacated judgment has no collateral estoppel or res judicata effect under Illinois law, *Matchett v. Rose*, 36 Ill.App.3d 638, 649, 344 N.E.2d 770, 779 (1976) (or any other law, *No East–West Highway Committee, Inc. v. Chandler*, 767 F.2d 21, 24 (1st Cir. 1985)), and Illinois law is determinative on the question because the judgment in question was rendered by an Illinois state court. 28 U.S.C. § 1738. The plaintiffs rely on *In re Memorial Hospital*, 862 F.2d 1299 (7th Cir.1988), for the contrary position. But that was a case in which we refused to vacate a judgment. Had we done so, then—as our opinion made clear—the judgment could not have been used in future litigation. Indeed this was one of the considerations that moved us not to vacate it.

*Id.* at 1302. Maybe the judge in *Chicago Courtesy* should not have vacated the judgment in that case either, but he did so, and thus deprived it of any future effect.

The principal question is whether the district judge was right to hold that, as a matter of law, the conduct of the City in failing to give the plaintiffs equal, or for that matter any, access to the livery dispatch booths did not deny the plaintiffs the equal protection of the laws. He was right.

The equal protection clause of the Fourteenth Amendment has a history. The primary purpose behind it was to prevent the southern states from making the newly freed blacks outlaws by denying them the protection of criminal, tort, and other state laws. *The Slaughter–House Cases,* 83 U.S. (16 Wall.) 36, 67–72, 21 L.Ed. 394 (1873); *Strauder v. West Virginia,* 100 U.S. 303, 306–07, 25 L.Ed. 664 (1879); *Palmer v. Thompson,* 403 U.S. 217, 220, 91 S.Ct. 1940, 1942, 29 L.Ed.2d 438 (1971). That purpose defines the core of the amendment's protection but a century and more of interpretation have marked out a broader periphery within which one can find decisions broadly, though not always completely, forbidding public discrimination against blacks and other groups (including other racial and ethnic minorities, children born out of wedlock, women, and aliens) believed to be particularly vulnerable to governmental oppression. None of those decisions supports the position of these livery companies, which instead implicitly appeal to a miscellany of decisions in which persons belonging to groups that the courts have not singled out for special protection under the equal protection clause, including business groups complaining about being placed at a competitive disadvantage by protectionist governmental action, for example by unequal taxation, have been held to have been denied equal protection. The plaintiffs would have us infer from these decisions a general duty on government not to make unjustifiable regulatory distinctions. There is no such duty. The Supreme Court has repeatedly upheld such distinctions against challenge under the equal protection clause, even when they appeared to reflect the operation of naked interest-group politics. *Railway Express Agency, Inc. v. New York,* 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949); *Williamson v. Lee Optical of Oklahoma, Inc.,* 348 U.S. 483, 488–89, 75 S.Ct. 461, 464–65, 99 L.Ed. 563 (1955); *Ferguson v. Skrupa,* 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963); *City of New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (per curiam); *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 464–70, 101 S.Ct. 715, 724–27, 66 L.Ed.2d 659 (1981). In *Lee Optical,* for example, the state forbade opticians to fit lenses to frames without a prescription from an ophthalmologist or an optometrist. In *Dukes,* the City of New Orleans forbade pushcart vendors to peddle food in the French Quarter—unless they had been doing so continuously for the previous eight years. Both measures were protectionist, anticompetitive; the public-interest rationales offered for them were threadbare, almost laughable. Nevertheless the Court refused to invalidate either measure. The Court is unwilling to constitute itself the nation's ombudsman, its court of administrative appeals.

The miscellany of decisions to which we referred are readily distinguishable from this case. They are cases in which states discriminate against nonresidents, *Zobel v. Williams,* 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982); *Metropolitan Life Ins. Co. v. Ward,* 470 U.S. 869, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985); *Williams v. Vermont,* 472 U.S. 14, 105 S.Ct. 2465, 86 L.Ed.2d 11 (1985); *Hooper v. Bernalillo County Assessor,* 472 U.S. 612, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985), or against vulnerable groups such as children of illegal aliens, *Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), or the mentally retarded. *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 446–50, 105 S.Ct. 3249, 3257–60, 87 L.Ed.2d 313 (1985). (The Court spoke in that case of "irrational prejudice against the mentally retarded." *Id.* at 450, 105 S.Ct. at 3260.) The plaintiffs place particular weight on *Plyler v. Doe,* and it is particularly odd that they should do so since

aliens are one of the groups, signally unlike the owners of transportation companies, that the Supreme Court has treated with special solicitude under the equal protection clause. It is true that the right at issue in *Plyler* was the right to an education (Texas was refusing to provide free public education to the children of illegal aliens), and the Court has been unwilling to accord education the status of a "fundamental right." Instead it asked whether Texas's policy was "irrational." It held that it was, and the plaintiffs ask us to infer that any irrational distinction that a state makes, even between two groups of livery companies, denies equal protection. But they are overgeneralizing from the cases. Illegal aliens are emphatically disabled from pursuing political remedies. Naturally the Court is unwilling to designate *illegal* aliens as a class specially protected by the equal protection clause; indeed, it allows the federal government pretty much carte blanche in dealing with aliens notwithstanding that the principle of equal protection was held applicable to the federal government in *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). But the innocent children of aliens, legal or illegal, have as a practical and human matter a greater claim on judicial resources than a business group that is already operating under the protection of licenses that as we are about to see exclude its competitors.

Yet despite all this, it is generally assumed that a completely, ludicrously arbitrary law would violate the equal protection clause even if it did not deny someone's "fundamental" rights or (otherwise) discriminate against a vulnerable group, and even if it did not bespeak systemic discrimination or irrational prejudice but merely an isolated regulatory caprice resulting in an arbitrary classification. *U.S. Railroad Retirement Bd. v. Fritz*, 449 U.S. 166, 177, 101 S.Ct. 453, 460, 66 L.Ed.2d 368 (1980); *Minnesota v. Clover Leaf Creamery, supra*, 449 U.S. at 464, 101 S.Ct. at 724; *City of New Orleans v. Dukes, supra*, 427 U.S. at 303–04, 96 S.Ct. at 2516–17; *Parham v. Hughes*, 441 U.S. 347, 352, 99 S.Ct. 1742, 1746, 60 L.Ed.2d

269 (1979) (plurality opinion). The significance of this principle, if it is a principle, must be very slight. Figleaves are cheap; why therefore would a state or a municipality ever fail to include a polite bow toward the public interest when it passed a measure that would otherwise stand exposed as a product of naked interest-group politics?

However this may be, the City's conduct, beginning with its reaction to the traffic congestion at O'Hare Airport—the reaction that is the germ of this litigation—has not been irrational, let alone patently, wildly, totally irrational, as the cases seem to require, although it may not win many prizes from institutes of public administration. The City had a congestion problem at O'Hare caused, or at least aggravated, by liveries. The suburban liveries were the principal offenders but only because the demand for suburban livery service is greater than the demand for livery service to Chicago, given the alternative methods of transportation available to arriving passengers bound for Chicago but not for those bound for the suburbs. Because suburban walk-up passengers lacked good competitive alternatives, it would not have done to prevent the suburban liveries from serving those passengers. The second-best solution, the solution that accommodated the competing interests in alleviating the congestion problem and in meeting the suburban transportation demand, was to establish livery dispatch booths but limit them to suburban liveries; this way the booths might be kept small and relatively unobtrusive. We are given slight pause by the fact that the City has since closed the dispatch booths. What has happened to those necessitous suburb-bound walk-up passengers? Maybe they didn't need the booths as badly as we have assumed. But the parties do not discuss the issue, so we shall pass it by.

So far, no irrationality—especially when we consider that suburban liveries cannot deliver passengers to Chicago destinations, whereas liveries licensed by the City of Chicago can deliver them anywhere. The latter have a built-in competitive advantage to which exclusion from the dispatch

booths could be viewed as a modest, partial offset.

But then some Chicago-licensed livery services became affiliates of suburban services and the suburban dispatchers began dispatching some Chicago-bound passengers to them. The unaffiliated Chicago livery services were placed at a disadvantage but not an irrational one. The question was how strictly the City would enforce its policy against allowing such livery services to use the dispatch booths. Enforcement is always a matter of less or more, for no policy is enforced to the hilt. It would be difficult to prevent dispatchers from occasionally calling an affiliated Chicago-licensed livery service as an accommodation to a walk-up passenger. The City did not try to prevent this. That was a rational enforcement judgment. But it provoked the suit by the *Chicago Courtesy* plaintiffs. The City lost that zany suit (zany if the analysis in this opinion is sound), with the result that those plaintiffs became the first unaffiliated Chicago livery services to have access to the dispatch booths. Maybe the City should not have settled the case on appeal (though naturally the plaintiffs in our case do not argue this), but having done so it was not irrational to announce, "Thus far but no further." The loss of a lawsuit at the trial level did not place the City under a constitutional duty to cave in to the demands of every other Chicago livery service. It could make them sue. And after the judgment in that first suit was vacated, they could not, by appealing to doctrines of preclusion such as res judicata or collateral estoppel, use the first suit as a lever for winning the second.

Disparity in treatment between two groups of litigants is a common result of parallel litigation. No principle of equal protection requires that lawsuits be decided consistently. And any felt disparity here is mitigated by the fact that these plaintiffs are not just ordinary livery services, but *limousine* services. Their rates are higher than those of taxis and, of course, the subway. It is doubtful that they are attractive to many walk-up passengers. But that is a detail. The essential point is that the City has not acted with that sheer senselessness that a plaintiff who does not belong to a vulnerable group or allege the infringement of a fundamental right must show in order to prove a denial of equal protection. The defendants were indeed entitled to judgment notwithstanding the jury verdict for the plaintiffs.

AFFIRMED.