**CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, et al., Plaintiffs–Appellants, Cross–Appellees,**

v.

**LADY BALTIMORE FOODS, INC.,** Defendant–Appellee, Cross– Appellant.

Nos. 91–2414, 91–2617.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 21, 1992.

Decided April 1, 1992.

Terence G. Craig (argued), Thomas C. Nyhan, James D. O'Connell, Thomas J. Angell, and Bruce L. Perlin, Cent. States, Southeast & Southwest Area Pension Fund, Law Dept., Rosemont, Ill., for Cent. States, Southeast and Southwest Areas Pension Fund, Marion M. Winstead, Robert C. Sansone, Robert J. Baker, Howard McDougall, Arthur H. Bunte, Jr., R. Jerry Cook, R.V. Pulliam, Sr. and Harold D. Leu.

James C. Murray, Jr., James E. Hanlon, Jr., Katten, Muchin & Zavis, Chicago, Ill., and James G. Baker (argued) and David L. Wing, Spencer, Fane, Britt & Browne, Kansas City, Mo., for Lady Baltimore Foods, Inc.

Before POSNER and MANION, Circuit Judges, and VAN SICKLE, Senior District Judge.[*]

POSNER, Circuit Judge.

A pension fund, Central States, brought this suit against an employer, Lady Baltimore Foods, for withdrawal liability under the Multiemployer Pension Plan Amendments to ERISA (the federal pension law). 29 U.S.C. §§ 1381 *et seq.* See generally *Central States, Southeast & Southwest Areas Pension Fund v. Slotky,* 956 F.2d 1369 (7th Cir.1992); *Peick v. Pension Benefit Guaranty Corp.,* 724 F.2d 1247, 1251–56 (7th Cir.1983). Behind withdrawal liability lies concern that if an employer who has workers with vested pension rights could withdraw from a multiemployer pension fund without any liability to the fund, the burden of honoring those vested rights would be shifted to the other employers covered by the fund. Withdrawal liability is heavy; so, fearing that the enactment of the Multiemployer Pension Plan Amendments Act would precipitate a rash of withdrawals from ERISA pension plans, Congress made the Act (enacted in September 1980) retroactive. Any present or former employer of workers who had obtained vested pension rights while employed by that employer was subject to withdrawal liability even if the rights had vested before 1980, unless the employer had withdrawn from the plan before the effective date of the Act—which was in April 1980, some five months *before* the Act was passed. *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 104 S.Ct.

---

[*] Hon. Bruce M. Van Sickle of the District of North Dakota, sitting by designation.

2709, 81 L.Ed.2d 601 (1984); *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986). The backdating of the effective date was later eliminated—but that gets us ahead of our story.

Not having withdrawn from the Central States pension plan by the deadline, Lady Baltimore was caught in the net spread by the Act. It withdrew in 1982 (pursuant to the collective bargaining agreement that it had signed in 1979)—much too late—and the following year Central States assessed a withdrawal liability against it of more than $200,000, even though Lady Baltimore had, since joining the plan in 1964, contributed more than $250,000 to it and only a handful of its employees had retired with vested benefits. It has been stipulated that "As of June 1, 1985, the present value of Lady Baltimore's 1964 to 1982 contributions to the Fund exceeded the present value of what the Fund will likely be required to pay to Lady Baltimore employees [former as well as present employees] by $257,780.00."

Lady Baltimore made a timely request to arbitrate its withdrawal liability but did not pay the assessment, so Central States filed suit in 1985, seeking "interim payments," which is to say installments of the assessment while the arbitration proceeding was going on. The following year the district court ordered Lady Baltimore to comply with the pension fund's demand for interim payments. This was a proper order. The Multiemployer Pension Plan Amendments Act provides that disputes over withdrawal liability shall be resolved by arbitration and that the employer may not defer payment pending arbitration. 29 U.S.C. §§ 1399(c)(2), 1401(a). If he wins the arbitration he will get back whatever he has paid but the rule is pay first, arbitrate after. *Robbins v. Lady Baltimore Foods, Inc.*, 868 F.2d 258, 264 (7th Cir.1989); *Robbins v. Pepsi–Cola Metropolitan Bottling Co.*, 800 F.2d 641 (7th Cir.1986) (per curiam).

While litigating in the district court, Lady Baltimore was also pursuing legislative remedies and in 1986 it managed to get passed an amendment to the Tax Reform Act of that year which stated that "in the case of an employer who entered into a collective bargaining agreement" that was effective on and until specified dates "any withdrawal liability incurred by the employer . . . as a result of the . . . withdrawal of the employer from the multiemployer plan before January 12, 1982, shall be void." 29 U.S.C. § 1461(h). The only employer intended to be affected by this amendment was Lady Baltimore, which had been a party to a collective bargaining agreement that was effective on and until the specified dates and which had withdrawn from the multiemployer plan on January 12, 1982. This exemption from the Multiemployer Pension Plan Amendments Act was sponsored by Senator Dole of Kansas, then the Senate Majority Leader, and cosponsored by Kansas's other senator. Lady Baltimore is a Kansas enterprise. The amendment contained, however, a slip of the pen. Lady Baltimore had withdrawn from the multiemployer plan on January 12, which, of course, was not before January 12. Cf. *United States v. Locke*, 471 U.S. 84, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985).

At first this was not noticed or at least no significance was attached to it. Instead, when Lady Baltimore interposed the amendment as a defense in the district court suit, the judge held that the amendment was unconstitutional (primarily as a denial of substantive due process) and entered a final judgment in favor of Central States for withdrawal liability. *Robbins v. Lady Baltimore Foods, Inc.*, 678 F.Supp. 1323 (N.D.Ill.1987). Later he added an award of liquidated damages and of attorneys' fees. "Liquidated damages" under the Multiemployer Pension Plan Amendments Act are a penalty (equal to 20 percent of withdrawal liability) imposed on employers such as Lady Baltimore that refuse to pay after receiving the notice of assessment, as they are supposed to do even if they dispute the assessment and so take it to arbitration. 29 U.S.C. § 1132(g)(2)(C)(ii); *Carpenters & Joiners Welfare Fund v. Gittleman Corp.*, 857 F.2d 476 (8th Cir.1988); *United Retail &*

*Wholesale Employees, Etc., Pension Plan v. Yahn & McDonnell, Inc.,* 787 F.2d 128, 144 (3d Cir.1986), aff'd, 481 U.S. 735, 107 S.Ct. 2171, 95 L.Ed.2d 692 (1987); *Banner Industries, Inc. v. Central States, Southeast & Southwest Areas Pension Fund,* 663 F.Supp. 1292, 1295 n. 3, 1300 n. 10 (N.D.Ill.1987).

Lady Baltimore paid the judgment but appealed to this court, which reversed. 868 F.2d 258 (7th Cir.1989). Being loath to decide a constitutional issue unnecessarily, we held that the issue of the constitutionality of the amendment was premature. The district court had failed to consider not only the possibility that because of the slip of the legislative pen the amendment did not apply to Lady Baltimore but also such equitable defenses as the company might have to the assessment of withdrawal liability. We remanded the case with instructions that the dispute over that liability be referred to arbitration. The case went to arbitration and in 1989, while it was in progress, Congress passed an amendment to the Lady Baltimore amendment, changing "before January 12" to "before January 16." On the strength of this change the arbitrator held that Lady Baltimore had no withdrawal liability and he ordered the pension fund to repay the interim withdrawal payments that Lady Baltimore had made pursuant to the district judge's order, together with the liquidated damages and attorneys' fees that Lady Baltimore had also paid. Central States then filed a new suit—this suit—attacking the arbitrator's award. The district judge agreed with the arbitrator that Lady Baltimore had no withdrawal liability and should not have to pay Central States' attorneys' fees. But he ruled that Central States had to return the liquidated damages and that Lady Baltimore was not entitled to an award of attorneys' fees despite its success in defeating withdrawal liability. 766 F.Supp. 650 (N.D.Ill.1991). Both parties appeal.

 Central States argues with great but unavailing energy that the Lady Baltimore amendment in its perfected, 1989 form (the original amendment may have been inadvertently inapplicable to Lady Baltimore—though we think not, for reasons explained later) violates a host of constitutional provisions because, to begin with, it has no valid public purpose. It is a naked redistribution and therefore a taking, a denial of equal protection, and a violation of "substantive" due process. A powerful senator did a favor for a constituent that involved taking money out of the pocket of Central States and giving it to Lady Baltimore. There is no preamble or legislative history or other indication that the Lady Baltimore amendment was intended to serve any more capacious concept of social welfare than that what is good for a Kansas manufacturer is good for the nation and let the devil take the hindmost.

We are troubled by this argument because it implies that a large proportion of what had seemed to us the routine legislative product of Congress and other legislative bodies in this country is unconstitutional. It is a long time since American government operated on the principle that that government governs best which governs least. Much modern legislation involves targeting government largesse on politically influential groups and the burdens of government on politically impotent ones. Not infrequently the legislation benefits a tiny handful of individuals or firms or even a single firm—the latter is especially common in tax legislation, see, e.g., *Prussner v. United States,* 896 F.2d 218, 227 (7th Cir.1990) (en banc), where the Lady Baltimore amendment would be entirely at home. Maybe that's why it was tacked on to the aesopically named Tax "Reform" Act. Stanley S. Surrey, "The Congress and the Tax Lobbyist—How Special Tax Provisions Get Enacted," 70 *Harv. L.Rev.* 1145 (1957). It is true that most of this special-interest legislation cannot be attacked in federal court because of the rule that denies federal taxpayers standing to challenge legislation that injures them only by increasing their taxes. *Frothingham v. Mellon,* 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923). But that is a matter of remedy rather than of right. It would be odd to suppose, as Central States' argument inescapably implies, that the characteristic output of democratic politics is un-

constitutional (albeit not challengeable), although the Constitution is thought in some quarters to require that conclusion. See, e.g., Richard A. Epstein, *Takings: Private Property and the Power of Eminent Domain* (1985).

It is true that the cases keep saying, in a dim echo of the "liberty of contract" jurisprudence that gave us *Lochner* and was repudiated in *West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937), that even legislation which does not deal with currently sensitive subjects such as race must be "rational" to survive challenge under equal protection and cognate notions. See *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976) (per curiam), and other cases cited in *Pontarelli Limousine, Inc. v. City of Chicago*, 929 F.2d 339, 342 (7th Cir.1991). But when we asked Lady Baltimore's lawyer what set of circumstances might make such a thing as the Lady Baltimore amendment irrational and therefore invalid, he could suggest none. He plainly believes, though without being quite willing to admit it, that merely "economic" regulations can never flunk the test of rationality. He may be right. They may of course flunk other constitutional tests, including some drawn from the equal protection clause. The Supreme Court continues to invalidate discriminatory state taxes. *Allegheny Pittsburgh Coal Co. v. County Commission*, 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989). But the immediate question is whether such regulations can ever flunk the rationality test. Perhaps the Supreme Court will change course on this subject once more but for now we are bound by precedents that impose an extraordinary and perhaps insuperable burden on an individual or firm that challenges the constitutionality of a statute merely because it lacks any perceptible connection to a tenable conception of the public welfare. Which the Lady Baltimore statute does not lack—quite. The imposition of withdrawal liability, fairly describable as draconian, by the Multiemployer Pension Plan Amendments Act was made retroactive for perfectly good reasons, but the effect nonetheless was to impose hardship on a number of individual firms of which Lady Baltimore, for all that Central States has been able to show, was one. In Lady Baltimore's case, not only was the imposition of this liability retroactive (and it was: Lady Baltimore did not, it is true, withdraw until well after the passage of the Act; but because the Act's effective date was backdated, Lady Baltimore, if it missed that deadline, would presumably have thought it too late to try to beat withdrawal liability by withdrawing). In addition the liability itself appears to be, if we may judge from the stipulation quoted earlier, wholly disproportionate to the cost—quite possibly zero—that the withdrawal imposed on the pension fund. Either through lack of foresight or out of a desire to have a completely mechanical algorithm for computing liability regardless of the inequities produced thereby—a fair or at least plausible description of the pertinent statutory provision, 29 U.S.C. § 1391—Congress in the Multiemployer Pension Plan Amendments Act failed to create an exemption for such a case. So Lady Baltimore went to Congress and asked for and got some fine-tuning.

Certainty is desirable but equity has its claims too. We could not pronounce the adjustment in liabilities brought about by the Lady Baltimore amendment irrational in a constitutional sense unless conceivably we were pointed to other employers in the identical situation as Lady Baltimore yet stuck with withdrawal liability. That would be a test case of the continued vitality of the rationality standard in the sphere of economic regulation. But Central States points to no employers comparable (let alone identical) to Lady Baltimore yet subject to withdrawal liability. If a statute of general application fits all firms within its scope but one, the exemption of that one would not be irrational. We cannot say that this is not the case here, because Central States has offered no evidence or even argument to make us think otherwise and also because Lady Baltimore was not the first firm to win a congressional reprieve from withdrawal liability. By section

558(a) of the Deficit Reduction Act of 1984, Congress eliminated withdrawal liability for employers who had withdrawn from ERISA plans between April and September 1980. And later it allowed employers who were parties to binding withdrawal agreements to escape withdrawal liability even if their withdrawal had not taken effect until the end of 1980. See historical note to 29 U.S.C. § 1381. These enactments—which while eliminating the most conspicuous retroactive feature of the Act failed to benefit Lady Baltimore because it had withdrawn from its ERISA pension plan after 1980—suggest that Lady Baltimore has a claim for relief that goes beyond friendship with powerful legislators. For all we know it is the only employer to have fallen through the cracks in the amendatory legislation, the validity of which is not questioned. To say that Congress cannot honor an equitable claim for exemption from a harsh law merely because it is the claim of only one firm—that a federal statute cannot have only one beneficiary—would be tantamount to ruling private bills unconstitutional, a step that we are naturally reluctant to take, especially without being asked to take it. See generally Note, "Private Bills in Congress," 79 *Harv.L.Rev.* 1684, 1685–88 (1966); William N. Eskridge, Jr. & Philip P. Frickey, *Cases and Materials on Legislation: Statutes and the Creation of Public Policy* 398 (1988).

Furthermore, the interference with economic freedom here—the interest that underlies the "liberty of contract" jurisprudence that Central States' complaint evokes—is not the exemption of Lady Baltimore from the Multiemployer Pension Plan Amendments Act; it is the Act itself. The Act expanded the reach of the federal pension law, itself a dramatic interference with the economic freedom of employers and employees, and did so in a way arguably in violation of the due process and taking clauses, though the Supreme Court held otherwise in the *Gray* and *Connolly* cases cited earlier in this opinion. Not the Act, but the amendment to the Act exempting Lady Baltimore, does homage to liberty of contract. It restores contractual rights infringed by the Act that it amended. We

cannot divine what constitutional policy would be furthered by invalidating the amendment.

Central States is on stronger ground when it emphasizes not the singling out of one company for an exemption from general legislation but the placing of the entire cost of that exemption on a single company. When Congress passes a typical piece of "porkbarrel" legislation the costs are spread among the whole federal taxpaying public and the injury to the individual taxpayer is thus infinitesimal, although this is to take rather a myopic view since the burden of the totality of such legislation on the individual is great. Here Congress has said in effect that Central States must fund the exemption for Lady Baltimore—the Lady Baltimore "bailout"—all by itself.

In fact Central States is nothing like an individual. It isn't even much like a normal firm. It is a nonprofit entity composed of hundreds of individual employers who in turn employ in the aggregate many thousands of workers. Any loss to Central States will be spread among this large group of firms and workers, with the Pension Benefit Guaranty Corporation and ultimately the federal taxpayer in the background to insure the vested pension rights of participants in Central States' plans. But forget this and consider Central States as if it were a single entity in every practical sense. Then we have Congress' telling Central States to make a refund to Lady Baltimore rather than Congress's bailing out Lady Baltimore itself.

This sounds worse than it is. Suppose the Lady Baltimore amendment had been part of the original Multiemployer Pension Plan Amendments Act. The impact on Central States would have been the same. The reason that if the amendment is upheld Central States must write a check to Lady Baltimore rather than merely be unable to collect withdrawal payments from it is that in the middle of the judicial proceedings Lady Baltimore decided to pay the district court's judgment for interim withdrawal payments and liquidated damages, rather than seek a stay pending the appeal that it ultimately won in great part. It should not

be punished for that decision, which in any event is irrelevant to whether the amendment should be struck down as a naked redistribution.

■ That decision to pay in 1988 may have an additional significance, however. A judgment that has become final through exhaustion of all appellate remedies is a property right, *Pennsylvania v. Wheeling & Belmont Bridge Co.*, 59 U.S. (18 How.) 421, 431, 15 L.Ed. 435 (1856); *McCullough v. Virginia*, 172 U.S. 102, 123–24, 19 S.Ct. 134, 141–42, 43 L.Ed. 382 (1898); *Hodges v. Snyder*, 261 U.S. 600, 603, 43 S.Ct. 435, 436, 67 L.Ed. 819 (1923); *Tonya K. by Diane K. v. Board of Education*, 847 F.2d 1243, 1247–48 (7th Cir.1988), which Congress could not take away without paying just compensation—perhaps (at least in this case) could not take away at all, either because the taking in this case has no public use, or because it invades the judicial power of the United States, which Article III of the Constitution confides to the federal courts exclusively. *United States v. O'Grady*, 89 U.S. (22 Wall.) 641, 647–48, 22 L.Ed. 772 (1875); *Tonya K. by Diane K. v. Board of Education, supra*, 847 F.2d at 1247. Central States points out that the district court's judgment in its favor in 1988 was affirmed by this court the following year and, so far as the interim payments and liquidated damages and attorneys' fees are concerned, became final then (or shortly afterward) since neither party attempted to take the case to the Supreme Court. It became final, moreover, several months before the 1989 amendment to the original Lady Baltimore amendment finally succeeded in taking the company out of the Multiemployer Pension Plan Amendments Act. So Congress is trying to take away a final judgment, and to do so without compensation.

This argument fails on two grounds. The first is that the original Lady Baltimore amendment was, despite its botched drafting, applicable to Lady Baltimore and thus canceled the company's withdrawal liability well before any final judgment was entered. It is true that the Supreme Court has on occasion, notably in *United States v. Locke, supra*, given a literal reading to a statute containing an obvious mistake in drafting. But the general rule honored even by interpretive literalists is that if a literal reading would produce an absurd result the interpreter is free (we would say compelled) to depart in the direction of sense. *Green v. Bock Laundry Machine Co.*, 490 U.S. 504, 527, 109 S.Ct. 1981, 1994, 104 L.Ed.2d 557 (1989) (Scalia, J., concurring); *Burns v. United States*, —— U.S. ——, 111 S.Ct. 2182, 2186–87, 115 L.Ed.2d 123 (1991) (opinion for the Court, by author of *Locke* ); see also *Public Citizen v. U.S. Dept. of Justice*, 491 U.S. 440, 453–56, 109 S.Ct. 2558, 2565–67, 105 L.Ed.2d 377 (1989), and cases cited there; *id.* at 470, 109 S.Ct. at 2574 (Kennedy, J., concurring). The rule is not limited to garbled language. Rule 609(a)(1) of the Federal Rules of Evidence, construed in the *Green* case, is a perfectly straightforward, flawlessly grammatical, syntactically impeccable prose specimen. But the Supreme Court, quoting (490 U.S. at 511, 109 S.Ct. at 1985) this court's remark that the rule "can't mean what it says," *Campbell v. Greer*, 831 F.2d 700, 703 (7th Cir.1987), interpolated "criminal" before "defendant" so that the rule would not create an arbitrary disparity between the rights of cross-examination of civil plaintiffs and of civil defendants. It is plain, and indeed conceded and even emphasized by Central States itself—which so far as we are aware coined the term "Lady Baltimore amendment" to describe the original as well as the amended provision of the Tax Reform Act—that the original amendment would be a nullity were it not interpreted to apply to Lady Baltimore, since there is no other entity to which it could have applied.

We understand the case for literal or strict construction. Literalism is easy—too easy—to deride, because it misdescribes communication. Suppose the president of Lady Baltimore told his assistant that he was convening a meeting at which there would be a number of smokers and the assistant should fetch for it all the ashtrays he could find, and the assistant complied by ripping some ashtrays off the walls and stealing others. (The example is

from Gerald MacCallum, "Legislative Intent," in *Essays in Legal Philosophy* 237, 256–57 (Robert S. Summers ed. 1968).) The assistant's literalism would get him fired. The literalists of statutory interpretation know all this. Their concern is political rather than epistemological or hermeneutic. They are worried that the gauntlet that the Constitution requires bills to run before they become law will be bypassed if judges give heed not just to the enactment itself but to what individual members of Congress said about it, perhaps in a deliberate effort to influence judicial interpretation. *Continental Can Co. v. Chicago Truck Drivers, Etc., Pension Fund*, 916 F.2d 1154 (7th Cir.1990). There is no danger of that here. Either the original Lady Baltimore amendment was a nullity, or it exempted Lady Baltimore. If there was a congressional majority for the first position, it is hard to understand why the amendment was enacted at all. No one has suggested and we cannot think up on our own an alternative to the hypothesis that the Lady Baltimore amendment was intended by every member of Congress who voted for it to exempt Lady Baltimore.

But even if this is wrong and there was no effective Lady Baltimore amendment until 1989, neither was there any final judgment in that year. Lady Baltimore paid the district court's judgment in 1988 but there was no finality then because the company was pursuing an appeal that it hoped would result in its getting all its money back. Our order of remand postponed all issues of liability to the arbitration, as the arbitrator at least believed, because he addressed the issue of liquidated damages as well as that of the basic withdrawal liability itself. We did say that the district judge had been right to order Lady Baltimore to make withdrawal payments pending arbitration (and this is relevant to the issue of liquidated damages, taken up next). But we made clear that our ruling was without prejudice to the question whether Lady Baltimore might have the right to get the payments back, whether by reason of the first, albeit defective, Lady Baltimore amendment or because of equitable defenses open to it in the arbitration proceeding that we directed. 868 F.2d at 264–65.

All this would be clearer if instead of commencing a new suit—this suit—Central States had resumed the previous suit after the arbitration, as it could well have done. When we remanded the case for arbitration, 868 F.2d at 265, we didn't tell the district judge to dismiss the case. We assumed it would be stayed while the parties arbitrated and then resume if as predictable one or both of the parties wanted to challenge the arbitrator's award or to resume their dispute over the constitutional issue that we had held must abide the arbitration. Central States cannot be permitted to gain an advantage by its puzzling decision to drop that suit and start a new one (and pay another filing fee).

It is true that Central States' entitlement to interim payments was independent of the issues in the arbitration, and of the constitutionality of the Lady Baltimore amendment. It rested on the rule that you must pay upon the receipt of the notice of assessment and dispute the assessment (if you want to) afterward. Being unaffected by the order of remand, Central States' entitlement to interim payments might be thought to have vested—to have become constitutional property in the sense in which we spoke in *Reed v. Village of Shorewood*, 704 F.2d 943, 948 (7th Cir.1983) ("what is securely and durably yours under state (or ... federal) law, as distinct from what you hold subject to so many conditions as to make your interest meager, transitory, or uncertain")—and thus to have been placed beyond the power of Congress to destroy, at least without compensation, when we affirmed the order to make the interim payments. We needn't decide that. The entitlement in question is like a landlord's right in a security deposit. He can hold the money but he must give it back eventually unless some condition materializes that allows him to keep it. Central States held the interim payments only as (in effect) a bailee until its right to impose withdrawal liability on Lady Baltimore was finally adjudicated. And that

came after the second Lady Baltimore amendment.

█ So there has been no violation of Central States' constitutional rights but, turning now to the cross-appeal, we think Central States is entitled to keep the liquidated damages that the district court awarded it. Those damages are as we said a penalty for trying to litigate before paying rather than paying upon assessment and litigating to get the payments refunded. While it is possible that when Congress in the Lady Baltimore amendment voided the company's withdrawal liability it meant to void as well all incidental penalties, it did not say that and we are reluctant to read its words so. We note the analogy to criminal contempt: a judgment for contempt is not invalid merely because the order that the contemnor disobeyed turns out to have been invalid. *Maness v. Meyers,* 419 U.S. 449, 458, 95 S.Ct. 584, 591, 42 L.Ed.2d 574 (1975); *United States v. Lowery,* 733 F.2d 441, 446–47 (7th Cir. 1984). Another analogy is to the district court's power, recently affirmed by the Supreme Court, to impose sanctions under Fed.R.Civ.P. 11 even though the court is later determined to have lacked jurisdiction over the case. *Willy v. Coastal Corp.,* — U.S. ——, 112 S.Ct. 1076, 117 L.Ed.2d 280 (1992). Liquidated damages under the Multiemployer Pension Plan Amendments Act are something that an employer who has withdrawn from an ERISA plan must pay whether or not he has any withdrawal liability. He must pay as a penalty for refusing to follow the statutory procedure for challenging assessments of withdrawal liability. Liability for liquidated damages is separate from the underlying withdrawal liability itself.

█ The final question is whether Lady Baltimore is entitled to an award of attorneys' fees. 29 U.S.C. § 1132(g)(1). (There can be no doubt that Central States is not entitled to an award of its attorneys' fees.) Three different types of fee are sought: fees incurred in the arbitration proceeding; fees incurred in the district court before the passage of the first Lady Baltimore amendment in 1986; and fees incurred in the district court and this court since. As to the first, the arbitrator could not have awarded fees in the absence of misconduct or bad faith, neither of which is suggested here, by the party sought to be charged. 29 C.F.R. § 2641.9(c); *Rootberg v. Central States, Southeast & Southwest Areas Pension Fund,* 856 F.2d 796, 800 (7th Cir.1988). As to the second, Lady Baltimore properly conceded at argument that Central States had a substantial basis (the test in this circuit, see *Pritchard v. Rainfair, Inc.,* 945 F.2d 185, 191 (7th Cir. 1991); *Bittner v. Sadoff & Rudoy Industries,* 728 F.2d 820, 830 (7th Cir.1984)) for believing that Lady Baltimore had withdrawal liability, so Lady Baltimore cannot get those fees back either. As to the fees that it incurred after Congress spoke, its claim is stronger because Central States' constitutional challenge, while not frivolous, may not have had quite the "solidity" of which we spoke in *Bittner* and *Pritchard.* Still, until 1989 Central States had a solid though not to us a sound basis for challenging the applicability, as distinct from the constitutionality, of the Lady Baltimore amendment, and Central States prevailed in the district court in the first round and has prevailed in this court on an important part of its case—the liquidated damages. This is enough to justify the district judge's decision to let each party bear its own legal expenses.

There are some other issues but we need not discuss them. For example, Central States' argument that the Lady Baltimore amendment is a bill of attainder is absurd and requires no (other) comment. The judgment is affirmed insofar as it cancels Lady Baltimore's withdrawal liability and rejects the requests for attorneys' fees, but it is reversed insofar as it orders the repayment of the liquidated damages.

AFFIRMED IN PART AND REVERSED IN PART.