CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, et al., Plaintiffs,

v.

HUNT TRUCK LINES, INC., Defendant.

No. 96 C 5634.

United States District Court, N.D. Illinois, Eastern division.

Jan. 12, 1999.

See also 43 F.Supp.2d 942.

Jon K. Stromsta, Robert Anthony Coco, James Patrick Condon, John Joseph Franczyk, Jr., Central States Law Department, DesPlaines, IL, Terence George Craig, Sheet Metal Workers National Pension Fund, Alexandria, VA, for Central States Southeast and Southwest Areas Pension and Health and Welfare Funds.

Robert Anthony Coco, James Patrick Condon, John Joseph Franczyk, Jr., Terence George Craig, Sheet Metal Workers National Pension Fund, Alexandria, VA, for Howard McDougall.

Mark Anthony Spognardi, McBride, Baker & Coles, Chicago, IL, Herve H. Aitken, Roy A. Sheetz, Taylor, Thiemann & Aitken, Alexandria, VA, for Hunt Truck Lines, Inc..

## ORDER

NORDBERG, District Judge.

Plaintiffs have filed this action seeking to collect interim withdrawal liability payments under the Employee Retirement Income Security Act of 1974, as amended by the Multiemployer Pension Plan Amendments Act of 1980.[1] Before the court are the parties' cross-motions for summary judgment. For the reasons set forth below, this court grants summary judgment in favor of the defendant.

## BACKGROUND

The following facts are undisputed unless otherwise noted. Defendant Hunt Truck Lines, Inc. ("Hunt") is an Iowa corporation with its principal place of business in Minnesota. Plaintiff Central States, Southeast and Southwest Areas Pension Fund ("Central States") is a multiemployer pension plan, and plaintiff Howard McDougall is the trustee of the plan.

Until approximately May 28, 1994, Hunt contributed to Central States on behalf of Hunt's employees covered by various collective bargaining agreements. On or about May 25, 1994, Hunt sold its assets to Wintz Parcel Drivers, Inc. ("Wintz"). However, the sale of assets did not constitute a "withdrawal" from Central States because the transaction satisfied the criteria for such sales under 29 U.S.C. § 1384. Central States approved of the sale of assets, concluding that it met the requirements of § 1384. Under § 1384, Hunt only would be liable to Central States if Wintz made a withdrawal and then failed to make withdrawal liability payments. In other words, Hunt would be secondarily liable to Central States.

Several years later, on May 31, 1996, Central States sent Hunt a Notice and Demand for Payment of Withdrawal Liability. Central States assessed Hunt for $303,372.75 in withdrawal liability. Hunt received the Notice and Demand on June 3, 1996. However, it was not until well over a month later—on or about July 27, 1996—that Wintz made a complete withdrawal from Central States within the meaning of 29 U.S.C. § 1383. Thus, at the time Central States sent the May 31, 1996 Notice and Demand to Hunt, Wintz had not completely withdrawn from the plan.

As will be discussed below, the timing of the Wintz withdrawal is important for purposes of this ruling, and Central States has raised only a minor challenge to the July 27, 1996 date that will be used by this court. Initially, in its opening memorandum of law to this court, Central States seemed to agree with this basic time frame, stating that Wintz made a complete withdrawal "on or about July 20, 1996." (Opening Mem. at 2; 2/13/97 Keil Affidavit.) Whether the date is July 27th or July 20th is unimportant for this ruling because both dates are after the May 31, 1996 Notice and Demand. However, after

---

1. This case concerns only the issue of interim withdrawal liability payments. A separate action has been filed by Hunt, which deals with the question of final withdrawal liability payments and the arbitrator's award. That case is pending in the Northern District of Illinois (98 C 4466).

Hunt argued in its response brief that the May 31, 1996 Notice and Demand was issued prematurely before Wintz had made a complete withdrawal, Central States then appeared to revise its position as to when the Wintz withdrawal actually occurred. In its reply brief, Central States argued that it occurred on or about May of 1996 when Central States Xpress, into which Wintz was merged, was forced into involuntary bankruptcy and ceased covered operations. (Reply at 3–4; 3/25/97 Kiel Aff.) Central States then explained that its original statement—that the Wintz withdrawal occurred "on or about July 20, 1996"—in fact was consistent with its revised position that the Wintz withdrawal occurred in May of 1996 because the original statement supposedly was not "specific" given that it included "on or about" language. This court simply finds this argument unbelievable. In any event, the parties have now stipulated in the arbitration proceedings that July 27th is the relevant date for the Wintz withdrawal, and thus that is the date this court will use.

On September 5, 1996, Central States filed this lawsuit, seeking a judgment for past due interim withdrawal liability payments, interest, liquidated damages, attorneys' fees, and costs pursuant to 29 U.S.C. § 1132(g)(2). It is undisputed that Hunt has not made any interim withdrawal liability payments.

On December 20, 1996, Hunt filed a demand for arbitration under 29 U.S.C. § 1401. On June 23, 1998, the arbitrator issued an Interim Award and held, among other things, that the May 31, 1996 Notice and Demand was issued prematurely. The arbitrator ordered Central States to reissue a new Notice and Demand and stated that the earliest date that a demand to Hunt could have been issued seeking secondary withdrawal liability pursuant to § 1384 would have been in mid-August 1996 and that the earliest the first pay-

ment by Hunt would have been due on November 1, 1996. On July 1, 1998, Central States issued a revised Notice and Demand containing a schedule of payments revised to reflect an initial payment date of November 1, 1996.[2]

### ANALYSIS

Both parties have moved for summary judgement on the same basic issue; namely, whether Hunt was required to make interim withdrawal liability payments under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1381–1461. Summary judgment may be granted when the record contains no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue for trial will be found only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). As will be explained below, this court finds that Central States cannot recover interim withdrawal liability payments from Hunt because Central States failed to comply with the statutory prerequisites under the MPPAA.

■ Before turning to the parties' specific arguments, it is helpful to briefly review the purpose and general structure of the MPPAA. "Congress enacted the MPPAA to protect the financial solvency of multiemployer pension plans." *Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., Inc.*, 522 U.S. 192, 118 S.Ct. 542, 546, 139 L.Ed.2d 553 (1997). When an employer withdraws from a multiemployer plan, the withdrawal can have a domino effect because it increases the burden on the other employers in the plan in turn increasing the chance that those employers will fail. *See Artistic Carton Co. v. Paper Industry*

---

**2.** On October 14, 1998, the arbitrator converted his Interim Award and Opinion of June 23, 1998 to a Final Award and Opinion.

*Union–Management Pension Fund,* 971 F.2d 1346, 1348 (7th Cir.1992) ("a series of withdrawals, much like a bank run, can leave the fund unable to pay off vested obligations"). Therefore, under the MPPAA, if an employer makes a "complete withdrawal," the employer must pay a penalty—called "withdrawal liability"—in the amount of the unfunded, vested pension benefits. *Central States, Southeast and Southwest Areas Pension Fund v. Wintz Properties, Inc.,* 155 F.3d 868, 871 (7th Cir.1998).

■ The MPPAA provides that the trustees of the plan initiate the process of imposing withdrawal liability. *Id.* Under § 1382, when an employer withdraws from a plan, the trustees determine the amount of withdrawal liability and then notify the employer. Although the trustees of the plan make the initial assessment of how much the employer must pay in withdrawal liability, the employer may contest liability by initiating arbitration. 29 U.S.C. § 1401. However, the MPPAA provides that while the arbitration is pending, the employer must make what are known as "interim" withdrawal liability payments until a final determination of liability is made. *Central States, Southeast and Southwest Areas Pension Fund v. Lady Baltimore Foods, Inc.,* 960 F.2d 1339, 1341 (7th Cir.1992). "If he wins the arbitration he will get back whatever he has paid but the rule is pay first, arbitrate after." *Id.* The MPPAA thus sets up what has sometimes been described as a "pay now, dispute later" scheme. *See Galgay v. Beaverbrook Coal Co.,* 105 F.3d 137, 139 (3d Cir.1997) ("Congress foresaw that the purpose of MPPAA would be undermined if employers could postpone paying their debts to pension funds by engaging in protracted litigation over withdrawal liability").

■ The Seventh Circuit has explained one rationale underlying the MPPAA's "pay now, dispute later" scheme as follows:

> Arbitration is supposed to speed final decision and reduce the costs of getting there. Efforts to alleviate the "harshness" of the MPPAA by examining the employer's probability of success before the arbitrator frustrate achievement of that objective. Instead of one speedy decision, there will be three slow ones. First the employer will resist making interim payments; the district judge will have to examine the merits of the plan's claim to determine the employer's probability of success before the arbitrator. Next the arbitrator will take evidence and decide. Finally the loser will return to court and ask the judge to set aside the arbitrator's decision.

*Trustees of the Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. Central Transport, Inc.,* 935 F.2d 114, 119 (7th Cir.1991).

This court now turns to the parties' specific arguments. Hunt asserts that Central States cannot recover interim withdrawal liability payments in this case because Central States prematurely issued the Notice and Demand before any withdrawal liability occurred. Specifically, Hunt notes that it is undisputed here that Hunt could not be liable for withdrawal liability under § 1384 until—at a minimum—Wintz had made a complete withdrawal from the plan.[3] Given that Wintz did not make a complete withdrawal until July 27, 1996 and that Central States issued the May 31, 1996 Notice and Demand well before that date, the Notice and Demand was premature. Hunt argues that it is a statutory condition precedent under the MPPAA that the trustees of the plan issue the notice only after withdrawal liability has occurred. According to Hunt,

---

**3.** In addition, Hunt argues that it could not be liable until after Central States had first tried and then failed to collect from Wintz. Because this court rules that Central States pre-maturely issued its Notice and Demand to Hunt before Wintz made a complete withdrawal, this court will not discuss this additional argument.

Central States "jumped the gun" and should be precluded from any recovery of interim withdrawal liability payments.

In response, Central States does not really dispute the fact that its notice was premature. In particular, Central States has conceded that Hunt could not be liable until Wintz made a complete withdrawal and that Central States issued the notice to Hunt before Wintz made a complete withdrawal.[4] Instead, Central States falls back on the general "pay now, dispute later" scheme and argues that Hunt must make interim withdrawal liability payments regardless of any dispute concerning whether the notice was proper or premature.

These arguments raise two primary questions. First, under the MPPAA, is there a requirement that notice must be issued only after a complete withdrawal has taken place? Second, if there is such a requirement, is it a statutory condition precedent that can be decided by the court in the first instance and one that will excuse the employer from making interim withdrawal payments or is it a question that—like disputes over the amount of the assessment—should be deferred to the arbitrators under the MPPAA's "pay now, dispute later" scheme and one that will not excuse interim withdrawal payments? This court will address each question in turn.

As to the first question, Hunt argues that the language of the MPPAA implicitly imposes a requirement that notice only issue until after withdrawal has occurred.[5] Hunt points to two sections of the MPPAA. Section 1381(a) provides:

*If an employer withdraws* from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability.

29 U.S.C. § 1381(a) (emphasis added). Section 1382 provides:

*When an employer withdraws* from a multiemployer plan, the plan sponsor, in accordance with this part, shall—

(1) determine the amount of the employer's withdrawal liability,

(2) notify the employer of the among of the withdrawal liability, and

(3) collect the amount of the withdrawal liability from the employer.

29 U.S.C. § 1382 (emphasis added).

Although these two sections do not directly state that notice may be issued only after withdrawal liability has occurred, the court agrees with Hunt that they clearly reflect a statutory scheme whereby the trustees of the plan must first wait until a withdrawal has occurred before issuing notice. This sequence is inherent in the statutory scheme, even if it is not specifically spelled out. As Hunt phrases the issue in its brief, in order for there to be "withdrawal liability," it only makes sense to say that there first must be a "withdrawal." Central States does not really dispute the point that the MPPAA imposes such a statutory sequence (*i.e.* withdrawal first and then notice). In its opening memorandum, Central States clearly stated that, to collect withdrawal liability, the plan must "first" determine the amount of withdrawal liability owed by the withdraw-

**4.** As noted above in the factual summary, Central States did argue briefly in its original reply brief that its Notice and Demand in fact was not premature. For the reasons already stated above, this court does not believe that this argument withstands rational scrutiny given Central States' own contradictory positions on this issue and given the parties' subsequent stipulation in their arbitration. Moreover, Central States fails to cite any case law or authority to support its undeveloped argument that Wintz made a withdrawal when it entered into bankruptcy even though it had not missed any payments at that point.

**5.** Hunt admits that this statutory requirement exists only "by implication" and that there is "scant precedent" regarding this "specific issue." Neither party has cited a case directly addressing this specific issue, and this court has found none.

ing employer and "then" must send notice. (Opening Mem. at 5.)

As to the second question of whether this requirement can be decided by this court or is one for the arbitrator, Central States relies on the well-established case law underlying the "pay now, dispute later" scheme and argues that any concerns about premature notice should be addressed by the arbitrator and should not excuse interim payments.

In support of its position, Hunt cites to the Seventh Circuit's decision in *Trustees of the Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. Rentar Indus., Inc.*, 951 F.2d 152 (1991). In *Rentar*, the Seventh Circuit discussed one equitable exception to the general "pay now, dispute later" scheme. The Seventh Circuit held that a court may excuse interim payments only if the employer "makes an affirmative showing that the pension fund lacks a colorable claim" and then demonstrates that it will suffer severe financial hardship due to the interim payments. *Id.* at 155. The Fifth Circuit also has recognized a similar equitable exception. *See Trustees of Plumbers and Pipefitters Nat'l Pension Fund v. Mar–Len, Inc.*, 30 F.3d 621, 626 (5th Cir. 1994) ("If the pension fund's claim is frivolous or not colorable, then the district court has a narrow measure of discretion to excuse payments of interim withdrawal liability"). The Third Circuit, however, has refused to recognize such an exception. *See Galgay v. Beaverbrook Coal Co.*, 105 F.3d 137 (3d Cir.1997). This court does not believe that the facts of this case really fit within the equitable exception because Hunt has not argued that the payments will cause financial hardship.

■ Although this court does not find that this case falls under such an equitable exception, this court does believe that the statutory structure of the MPPAA imposes an initial statutory prerequisite that a fund must issue the notice of liability only after the withdrawal triggering liability has occurred. Although admittedly there is little case law addressing this particular issue, several district courts have commented that the MPPAA notice requirement is a "prerequisite" or "precondition" to bringing a lawsuit to collect withdrawal liability payments. *See Canario v. Lidelco, Inc.*, 782 F.Supp. 749, 753 (E.D.N.Y.1992) ("compliance with the statutory notice requirements is a prerequisite to collection on a suit to recover withdrawal liability"); *Debreceni v. George Lamoureux & Co.*, 629 F.Supp. 598, 601 (D.Mass.1986) ("the notice requirement set forth in 29 U.S.C. § 1399(b)(1) is a precondition to a suit in federal court to collect withdrawal liability").

In addition, this position is implicitly supported by the Third Circuit's recent opinion in *Galgay*. Although the Third Circuit in *Galgay* refused to recognize an equitable exception to the requirement of interim payments, the Third Circuit nonetheless implicitly recognized that a fund must satisfy certain initial statutory prerequisites. After first discussing and emphasizing the importance of the general "pay now, dispute later" scheme, the Third Circuit stated: "Our jurisdiction is limited to ordering the employer to make interim payments *once the pension fund has demonstrated that it complied with the statutory requirements for calculating liability and notifying the employer.*" *Id.* at 140 (emphasis added). To support this statement, the Third Circuit cited to 29 U.S.C. § 1382—the same section relied upon by Hunt in this case. The Third Circuit characterized the issue of whether the fund complied with the statutory notice requirements as a "burden" that the must be "sustained" initially by the fund. *Id.* at 141.

■ This court recognizes the reasons behind, and the case law supporting, the general "pay now, dispute later" scheme. However, the issue in this case—whether a fund may jump the gun and issue notice before withdrawal liability has occurred—is different in kind and one that is a juris-

**846**

dictional prerequisite. As such, this court finds that proper and timely notice is a precondition for the triggering of the duty of the employer to make interim withdrawal liability payments. This is not a case where this court is attempting to "examin[e] the employer's probability of success" before the arbitration takes place, *Central Transport*, 935 F.2d at 119, but is instead one where this court is ensuring that the fund has complied with the procedural requirements of the MPPAA. Under the MPPAA, a fund is given the unilateral right to initiate the payment process simply by issuing a notice and demand after a statutorily-defined withdrawal has occurred. This court believes that along with this right the fund should have a responsibility to proceed in the proper statutory manner.

As noted previously, under the facts of this case and the parties' stipulation, Central States issued its notice prematurely before Wintz had made a complete withdrawal. Therefore, at the time Central States filed this lawsuit, it clearly had not complied with the MPPAA's notice requirements.[6] Central States has not argued for any equitable exception to excuse its own failure to observe the statutory prerequisites regarding notice, and this court is not aware of any such exception. As a result, Central States cannot collect interim liability payments.

### CONCLUSION

For the reasons set forth above, this court grants defendant Hunt's motion for summary judgment and denies plaintiffs' motion for summary judgment. Defendant's motion for leave to bring in a third-party defendant is stricken as moot. This is a final judgment.

---

6. Thus, this is not a case where the parties have a good faith dispute over exactly when the withdrawal occurred such that there is doubt as whether the notice was premature.